The defendant Mary Sepowski is the owner of premises in the town of Chester which, on the institution of this action, were known as 62 Middlesex Avenue but have since been renumbered as 86 Middlesex Avenue under General Statutes § 7-120. The property consists of a large dwelling set back from the street on a substantially landscaped and well-screened lot having a frontage of 240 feet and an area considerably in excess of the one-half acre required by its zoning classification, *Page 199 
residential district R-1/2. Containing an in-ground swimming pool, the property has the appearance of a small estate. Its parklike setting has attracted the interest of the office of mental retardation as a proposed community residence for mental retardates presently at Mansfield Training School under a recently expanded statewide rehabilitation program. The office of mental retardation is selecting 300 adult residents, from the total enrollment of 1450 institutionalized mental retardates capable of living in a community or group home, for placement in twenty-five additional community residences dispersed throughout the state.
Because of the property's desirability and availability, the state has negotiated a ten-year lease from Mary Sepowski to use her premises as a community residence for employable retarded adults, subject to proper zoning conformity or authority. The office of mental retardation intends to transfer an optimum of ten residents from Mansfield Training School to this environment under the care and supervision of a specially trained married couple employed by the state to serve as houseparents. Supportive staff personnel will visit the home for the education, recreation and other welfare needs of the residents, who will be employed in workshops arranged by the Seaside Regional Center and, hopefully, eventually in the community. In operating the proposed residence, the state will continue its legal and moral obligations to these people under a new philosophy and policy geared to the best interests and greatest welfare of its less fortunate citizens.
Article V, § 5.1, of the Chester zoning regulations includes, among permitted uses for this zone, single-family dwellings and up to eight roomers and boarders. Accordingly, under article XV, § 15.1, of the regulations, Mary Sepowski at the outset *Page 200 
applied to the zoning compliance officer for a certificate of compliance with these permitted uses for the proposed state operation of these premises. Her application was denied. Thereafter, on August 1, 1973, she made an application for a special exception under article V, § 5.1.f.6, "[t]o conduct a residence for retarded, employable persons, from approximately 16 years of age and up, under a State of Connecticut rehabilitation program for eight or nine retarded persons who are presently housed at the Mansfield Training Center, to provide a place for the persons where they can function as members of the community under the supervision of house parents."
By article IIn of the regulations, a special exception is defined as "[a] permitted use which must meet specific conditions as established within these Zoning Regulations and as specifically approved by the Commission in accordance with the standards hereinafter set forth." The special exceptions permissible for the Sepowski property are enumerated in article V, § 5.1.f: "1. Churches, day care centers, and schools, but not including correctional institutions and institutions for the insane or intemperate. 2. Bona fide clubs or community houses, not operated for profit. 3. Police Stations, fire houses, or other municipal buildings. 4. Public Service Companies as defined by Connecticut General Statutes Chapter 277. 5. Parks and playgrounds. 6. Medical hospitals, veterinarian hospitals, nursing homes, and old age homes. 7. Commercial kennels and veterinary hospitals. 8. Livery, boarding or riding stables. 9. A commercial greenhouse. 10. A cemetery of a church corporation or cemetery association having its principal office in the Town, and 11. A dump operated by the Town."
At the public hearing on this application, emotions ran high, pro and con. The Chester zoning commission *Page 201 
found the proposed use to meet the requirements of a nursing home and the necessary standards or criteria for special exceptions. The commission therefore approved Mary Sepowski's application "to conduct a residence for eight or nine retarded, employable persons, approximately sixteen years of age and up, coming from recognized state institutions for retarded persons and to be operated by the State of Connecticut under their Rehabilitation Program for a term of ten years." In granting this special exception, the commission imposed these conditions: "(1) That such use be undertaken under the control and supervision of the Director of Social Services of the Mansfield State Training School and Hospital and under the rules and regulations thereof; (2) [t]hat such use shall provide for not more than 9 retarded persons being in residence on the premises at any one time; and (3) [t]hat at all times there shall be one or more supervisors in residence on the premises who shall be qualified to supervise, control and direct the activities of retarded persons."
The plaintiff, an abutting owner and thereby aggrieved, has appealed from this action.
The issue presented is of immediate and great importance to the state and its citizens. The expanding program of rehabilitating our mentally retarded through community residence may face similar zoning hurdles in other areas. The plaintiff asserts that the proposed use does not constitute a nursing home within the purview of article V, § 5.1.f.6, of the zoning regulations but, instead, will establish an institution for the insane and is thus expressly excluded from the permissible special exceptions by the specific prohibition of § 5.1.f.1. The suggestion that the mentally retarded are insane is a disservice to such unfortunate individuals and deserves only *Page 202 
scant attention. The distinction between the mentally ill and the mentally retarded is literally self-apparent. A mentally ill or insane person is one who is "afflicted by mental disease to such extent that he requires care and treatment for his own welfare or the welfare of others or of the community." General Statutes § 17-176. On the other hand, the mentally retarded have "mental deficiency as defined by appropriate clinical authorities to such extent that a person so afflicted is incapable of managing himself and his affairs," but they shall not include the mentally ill as defined above. General Statutes § 17-258, Interstate Compact on Mental Health, art. II (g), (f). A real friend of the mentally retarded, by deed as well as word, speaking in gracious eloquence at the public hearing in support of this application designated the mentally retarded as "perpetual children."
It is well settled that the conditions permitting the use of property as a special exception must be found in the zoning regulations themselves. Beckish
v. Planning Zoning Commission, 162 Conn. 11, 14. A special exception relates only to such cases as are expressly provided for under the enunciated terms of the zoning regulations. These cases are spelled out in the regulations. It remains for the zoning authority to determine that the specified facts, circumstances and conditions exist, but the authority has no power to change, vary, or make a substitution for, what the regulations provide shall constitute a special exception. 1 Metzenbaum, Law of Zoning, 814 (2d Ed.).
The term "nursing home" is not defined in the zoning regulations, but, defined or not, its meaning is a question of law. Whether on the evidence at the hearing the proposed use as a community residence qualified under the legal meaning of the phrase *Page 203 
"nursing home" was a question of fact to be determined by the commission, subject to a review by the court of the reasonableness of its conclusion.Jeffery v. Planning Zoning Board, 155 Conn. 451,454. In General Statutes § 19-32, a "nursing home" is defined as "an establishment which furnishes, in single or multiple facilities, food and shelter to two or more persons unrelated to the proprietor and, in addition, provides services which meet a need beyond the basic provisions of food, shelter and laundry." The office of mental retardation does not propose to establish a nursing home on the Sepowski premises but rather a community or group home for a small number of retardates in a family setting. It proposes to transfer them from an institution to a home environment in a community. Medical, nursing, therapeutic and other needed services for the retardates will be purchased from the community, just as such services are provided for other residents of the community or obtained at Mansfield Training School or Seaside Regional Center.
The home will be under the supervision of the deputy commissioner on mental retardation, who is charged by law with the administration and operation of all state-operated community and residential facilities for the mentally retarded. In addition, he is responsible for establishing standards and exercising the requisite supervision of all state-supported boarding homes and other facilities for the mentally retarded. General Statutes § 19-4c. A comparison of the proposed state use of the Sepowski property with the standards established for the licensure of private dwellings as community residences for the mentally retarded under General Statutes § 17-174 illustrates the residential nature of the planned state operation and precludes its classification as a nursing home. See Regs. Conn. State Agencies §§ 17-174-1 — 17-174-3. Since the contemplated *Page 204 
community residence does not legally constitute a nursing home, the special exception granted on this basis is illegal.
Pursuant to article XV of the regulations, counsel for Mary Sepowski initially sought a certificate of compliance with the provisions of the zoning regulations from the zoning compliance officer for the proposed use. Failing to succeed in that move, he was directed to an application for a special exception, but even now he asserts the legality of his original insistence of zoning compliance under the permitted uses of article V, § 5.1, for this zone. This claim is twofold. One contention is compliance with § 5.1.d, which permits "[t]he letting of rooms or furnishing board by the resident of the premises to not more than 8 persons." Since there is no definition of the terms in this regulation, we must establish their legal meaning. Jeffery v. Planning Zoning Board,
supra. A "lodging house" or "boarding house" means "any house or building or portion thereof, in which six or more persons are harbored, received or lodged for hire, or any building or part thereof, which is used as a sleeping place or lodging for six or more persons not members of the family residing therein." General Statutes § 19-342. That the proposed community residence will not be a commercial lodging or boarding house is self-evident. The second definition, like § 5.1.d, presupposes operation by the principal resident of the premises, unlike the state's proposed operation and management of the Sepowski property. The planned group home does not, therefore, qualify as a rooming or boarding house within the permitted use for this zone.
The second claim of compliance by counsel for Mary Sepowski is that the proposed community residence constitutes a permitted single-family use of the single-family dwelling on the site. Here lies *Page 205 
the answer to the question raised by the state's lease of the Sepowski property. The answer is furnished by article IIg of the zoning regulations, which defines "family" as follows: "One or more persons occupying the premises as a single housekeeping unit, as distinguished from a group occupying a boarding house, lodging house, club, fraternity or hotel." It is not the mutual relationship between the occupants of the dwelling, but its use "as a single housekeeping unit" that controls, and that is what is contemplated by the state under the local supervision or surrogate paternalism of the houseparents. In determining the composition or membership of a family under zoning regulations, where the "ordinance has expressly defined the meaning of the term `family,' the declared definition of course controls."Planning Zoning Commission v. Synanon Foundation,Inc., 153 Conn. 305, 311. Since the family unit is not limited in number by its definition here, reference must be made to the standards established by the deputy commissioner on mental retardation and by the building, fire safety and public health codes. The Sepowski dwelling has been reasonably found to be adequate and safe for nine retarded persons at this time. Consequently, it is concluded that the proposed use of the Sepowski property as requested, in and of itself, is lawful. The action of the Chester zoning commission was, therefore, well intended but improperly premised and illegally concluded. Where a proposed use is permitted under the zoning ordinance, a special exception is not necessary. SeeDostmann v. Zoning Board of Appeals, 143 Conn. 297.
In view of the foregoing, the situation now presented to the court is one of first consideration. The certificate of compliance sought by Mary Sepowski and legally due her at the outset has been, in effect, obtained by special exception illegally *Page 206 
granted. The correction of the right conclusion made on the wrong legal premise is now the responsibility of the court. Upon a zoning appeal, this court, after a hearing, may "reverse or affirm, wholly or partly, or may modify or revise the decision appealed from." General Statutes § 8-8. In construing the same language in § 30-60 of the Liquor Control Act, our Supreme Court advisedly ruled in Sumara v. Liquor Control Commission,165 Conn. 26, 30-32, as follows: "[A]n examination of the history of the statute and the cases arising under it over a period of forty years compels the conclusion that the sole function of the reviewing court is to determine whether the commission acted arbitrarily, illegally or in abuse of its discretion; if it so finds, then, and only then, may it reverse, remand, or modify the decision and then only in order to make it conform to law.... The phrase `may modify or revise' has accordingly been interpreted narrowly in order to conform to constitutional limitations. `Under that provision, the court cannot, on an appeal, substitute its discretion for that vested in the liquor control commission; it can go no further than to make the decision of the commission conform to law or to a conclusion which is the only reasonable one upon the facts proven.'DeMond v. Liquor Control Commission ... [129 Conn. 642, 646]."
Having found that the special exception was illegally granted by the Chester zoning commission and that the proposed use of the Sepowski property, in and of itself, is permitted under article V, § 5.1, of the Chester zoning regulations, as a single-family dwelling use, the court is empowered, therefore, to "modify or revise" the commission's decision to bring it into conformity with the law. For these reasons, the decision of the Chester zoning commission is hereby modified and ordered recorded as *Page 207 
follows: The application of Mary Sepowski, dated August 1, 1973, to allow the state of Connecticut, as lessee, to operate a community residence, under the supervision of houseparents, on the premises 86 Middlesex Avenue, formerly known as 62 Middlesex Avenue, Chester, for retarded persons sixteen years of age and over and capable of employment under the rehabilitation program of the office of mental retardation is approved as a permitted use of a single-family dwelling in residential district R-1/2 under the Chester zoning regulations.
 Accordingly, the appeal of the plaintiff is dismissed.