CHARLES L. KNUDTSON ET AL., APPELLANTS, V. MICHAEL F. TRAINOR ET AL., APPELLEES.

345 N.W.2d 4

Filed March 2, 1984. No. 82-843.

Jack G. Wolfe of Wolfe, Hurd & Rierden, on brief, for appellants.

Richard J. Butler of Ginsburg, Rosenberg, Ginsburg, Cathcart, Curry & Gordon, for appellees Trainor.

Michael G. Heavican, Lancaster County Attorney, and Douglas D. Cyr, for appellees Lancaster County Office of Mental Retardation et al.

Debora D. Brownyard and Timothy F. Shaw, for amicus curiae Nebraska Advocacy Services for Developmentally Disabled Citizens, Inc.

Louis Michael Thrasher of Mattson, Ricketts, Davies, Stewart, Calkins & Duxbury, for amici curiae Association for Retarded Citizens—Nebraska and Association for Retarded Citizens—Capital.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, and SHANAHAN, JJ.

WHITE, J.

The appellants, owners of a house and lot in the Trendwood Addition to the City of Lincoln, Nebraska, brought suit in the district court for Lancaster County against Michael F. and Marie Ann Trainor, doing business as Trainor Investments, the Lancaster County Office of Mental Retardation, the County of Lancaster, and the individual members of the Lancaster County Board of Commissioners. The purpose of the suit was to enjoin all defendants from entering into a lease from the Trainors to the office of mental retardation of a house and lot in Trendwood for the purpose of operating a group home for five mentally retarded persons.

The trial court refused to enjoin the execution of the lease and the operation of the group home, and dismissed the petition. Appellants, Charles L. and Esther Knudtson, appeal. We affirm.

Although there are several assignments of error, the decisive issue is whether the restrictive covenants binding on all owners of lots in Trendwood prohibit the operation of a group home in the addition.

The restrictive covenant at issue states: "1. No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one detached

single family dwelling not to exceed two and one-half stories in height, and a private garage."

Two questions present themselves in an analysis of this provision as related to the factual situation here under consideration: (1) Is the operation of a group home a "residential" use? (2) Does the phrase "single family dwelling" describe an architectual style, or is it a description of the relationship of the persons occupying the structure?

We approach the analysis with the caveat that covenants which restrict the use of land are not favored by the law, and, if ambiguous, they should be construed in a manner which allows the maximum unrestricted use of the property. *Ross v. Newman*, 206 Neb. 42, 291 N.W.2d 228 (1980).

We review this matter de novo, taking into consideration the superior position of the trial judge as to credibility of witnesses where there are factual disputes. *Gerberding v. Schnakenberg*, *ante* p. 200, 343 N.W.2d 62 (1984).

In our review we accept the version of the facts as found by the trial court: "4. The five mentally retarded women who will be living in the proposed group home will share the common areas of the house, the living room, dining room and recreation room and they will prepare and eat their meals together. They will live in the proposed group home with their houseparents and will be taught the skills which are normally taught and performed in a residence such as taking care of the house, cleaning, preparing meals and money management.

. . . .

"6. . . . This proposed group home is not a halfway house but is a permanent residence intended to allow these five retarded women to lead fuller and more normalized lives in the community than would be possible in an institution."

At issue in *Reed v. Williamson*, 164 Neb. 99, 82 N.W.2d 18 (1957), was the enforceability of a clause in a document entitled "RESTRICTIVE COVE-

NANTS" and signed by all owners of an addition to Kimball, Nebraska. The clause provided that " '[a]ll of the lots in said Addition shall be exclusively a residential area . . . .' " *Id.* at 102, 82 N.W.2d at 20. The court then construed the clause against defendants who proposed to drill oil and gas wells on lots whose use was restricted.

In considering the meaning of the word "residential," this court in *Reed, supra* at 107-08, 82 N.W.2d at 23, quoted with approval from *Jernigan v. Capps,* 187 Va. 73, 45 S.E.2d 886 (1948): " 'It is not necessary that we go to a dictionary or a law book to ascertain the meaning of "a residential building." Giving the words their plain and ordinary meaning, we would say that such a building is one which is used for residential purposes,—that is, one in which people reside or dwell, or in which they make their homes, as distinguished from one which is used for commercial or business purposes. But if the obvious must be supported by authority or judicial precedent, we find that they are of the same view. Webster's New International Dictionary, 2d Ed., defines "residential" as: "Used, serving, or designed as a residence or for occupation by residents; * * *. Adapted to, or occupied by, residences; as, a residential quarter." ' "

No evidence was introduced that could support a finding that the proposed use of the residence as a group home involved the operation of a business or commercial enterprise as those terms are commonly understood. Cases in accord with the view we take here, that the operation of a group home is a residential purpose within the meaning of a covenant that the property shall be used only for residential purposes, are: *Hobby & Son v. Family Homes,* 302 N.C. 64, 274 S.E.2d 174 (1981); *Linn County v. City of Hiawatha,* 311 N.W.2d 95 (Iowa 1981); *Costley v. Caromin House, Inc.,* 313 N.W.2d 21 (Minn. 1981); *Berger v. State,* 71 N.J. 206, 364 A.2d

993 (1976); *Crowley v. Knapp*, 94 Wis. 2d 421, 288 N.W.2d 815 (1980).

Holding, as we do, that the group home is a use permitted under the "residential purposes" portion of the covenant, we proceed to a discussion of the second question.

Although no Nebraska case appears to have discussed the issue of the implications of the words "single-family dwelling," other states have done so. The trial court discussed those cases in its order, and we adopt the language of the trial court. "The Georgia Court in *Sissel v. Smith*, 242 Ga. 595, 250 S.E.2d 463, held that a limitation on the type of building that can be constructed on a lot is not also a limitation on its use. The Court said: 'Strictly construed, restrictive covenant restricting use of lots in subdivision to "single-family residence purposes only" should be interpreted as a restriction upon types of buildings that can be constructed on lot, that is, only buildings intended to be used as residences can be constructed, and not as a limitation on types of activities that can take place in buildings so constructed; thus construed, whether restrictive covenants prevent incidental use of a portion of residence for business or trade purposes is a question of fact depending upon facts and circumstances of a given case.'

"The New Jersey Supreme Court in *Y.M.C.A. v. Board of Adjustment*, 134 NJ Super 384, 341 A.2d 356 stated: 'To suggest that "families" composed of residents of group homes are to be distinguished from natural families in determining which single-family districts will be considered open to them, is to confuse the power to control physical use of premises with the power to distinguish among occupants making the same physical use of them.'

"The New York Court in *Little Neck Community Association v. Working Organization*, 383 NYS2d 364, 52 A.2d 90 stated: "It is our opinion that a group home for mentally retarded children constitutes a

family for the purpose of a zoning ordinance...zoning is intended to control types of housing and living and not genetic or intimate and internal family relations of human beings.'

"The Minnesota Supreme Court in *Costly* [sic] *v. Caromin House, Inc.*, 313 N.W.2d 21 (1981) considered questions very similar to those presently before this Court when it construed a city zoning ordinance. The Minnesota Supreme Court stated: 'Restrictive covenants are strictly construed against limitations on the use of property.... Since the law favors the unrestricted use of property, courts will not adopt a strained construction in favor of restrictions.... According to Webster's Third New International Dictionary (1971), a dwelling is simply "a building or construction used for a residence." The group home fits this description both in appearance and in use and thus complies with the covenant.

" 'Even if the covenant were interpreted to permit only "single-family dwellings", the group home would be a permitted use under the same reasoning as discussed above for the definition of "family" in zoning regulations. From the outside, the home looks like all other single-family homes in the neighborhood. The residents live in a family-type setting and call the dwelling their home. The courts in other jurisdictions have found similar group homes in compliance with single-family restrictive covenants.'

"The Michigan Appellant [sic] Court in the case of *Malcolm v. Shamie*, 290 N.W.2d 101 (1980) held that five mentally retarded women living with a foster parent in an environment therapeutically designed to emulate a more conventional family environment constituted a 'family' for purposes of a restrictive covenant precluding any building other than detached single-family dwellings. The restrictive covenant before that court read as follows: 'No structures or buildings shall be erected, altered, placed or permitted to remain in any of the lots...

other than one detached single-family dwelling not to exceed two stories in height and a private garage for not more than two cars.'

"The Michigan court stated: 'Five mentally retarded women living with a foster parent in an environment therapeutically designed to emulate a more conventional family environment should also be considered a family and such use of the property an appropriate family residential use. The residents are more than a group of unrelated individuals sharing a common roof. They do not have natural families on which to rely, and due to their unique circumstances, it is unlikely that these women will ever rejoin their parents or marry and form independent families. The substitute family provided by the group home allows the residents to lead more normal and meaningful lives within the community than would be feasible were they institutionalized.'

"The Michigan court in *Malcom* [sic] *v. Shamie,* supra, noted that cases of this nature present a confrontation between two basic public policies. 'First, restrictive covenants are valuable property rights subject to judicial protection against those who would violate them. Second, this state encourages the maintenance and development of quality programs and facilities for the care and treatment of the mentally handicapped.' The Court recognizes the confrontation between these two basic policies in the case now before it and have [sic] endeavored to give full consideration to those policies.

"From an examination of the evidence before this Court and the law applicable to these types of cases it appears that the house at 1625 South 77th Street will remain a single-family dwelling if occupied by the five mentally retarded women and their houseparents. The house will be [sic] appear no different than any of the other houses in the neighborhood to any persons passing by. The house itself will remain the same with the addition of a wood deck which will also serve as a fire escape. The five

women and their houseparents will live together as a family unit."

The decision of the trial court was correct and is hereby affirmed.

AFFIRMED.

CAPORALE and GRANT, JJ., not participating.