Bob JACKSON and Sue Jackson, husband and wife; Robert Cobey and Susan Cobey, husband and wife; Charles Smith and Janette Smith, husband and wife, Appellees-Plaintiffs,

v.

Larry E. WILLIAMS and Xan H. Williams, husband and wife; Larry Emmett Williams, as Trustee of the Revocable Inter Vivos Trust of Larry Emmett Williams, Appellants-Defendants.

No. 61405.

Supreme Court of Oklahoma.

Dec. 10, 1985.

Rehearing Denied March 10, 1986.

John D. Boydston, Messrs. Harris & Boydston, Tulsa, for appellants-defendants.

James R. Hays, Messrs. Ellison, Hays & Nelson, Tulsa, for appellees-plaintiffs.

Paul A. Karns, Jenks, Jon R. Garrett, Garrett & Rogers, Detroit, Mich., for amicus curiae Homelife Ass'n for the Handicapped, Inc.

OPALA, Justice.

Three questions are presented for decision:

█ Does the use of a residence as a group home for five mentally handicapped women and their housekeeper constitute a "single-family dwelling" within the meaning of the City of Tulsa's zoning ordinance? [2] Does maintenance of a group home offend the applicable restrictive covenant that limits the use of the property in the zoned district to a residential purpose and the character of the structure to a "single-family dwelling?" and [3] Does the operation of a group home violate the applicable

restrictive covenant prohibiting noxious or offensive trade or activity being carried on upon any lot within the subdivision? We answer the first question in the affirmative and the last two in the negative.

This controversy centered on the attempt by Larry and Xan Williams [collectively called Williams], defendants, to lease their home in the Park Plaza South III subdivision in Tulsa, Oklahoma, to the Oil Capital Association for the Handicapped, Inc. [Association], a non-profit organization. The Association planned to use the house as a group home for five mentally handicapped women, one of whom was to be a twenty-one year old daughter of Williams.[1] A housekeeper would reside in the home for the primary purpose of supervising and running the household.[2] Williams had several years earlier placed the house in a revocable inter vivos trust with Larry Williams as the trustee. The trust would receive $1,000.00 per month as rent from the Association, which in turn would collect rent from the five sublessees.[3] The salary of the housekeeper would be paid by the Association.

Several of the residents [Homeowners] in the subdivision sought to enjoin the establishment of the group home in their neighborhood as being violative of certain restrictive covenants and zoning laws. The homeowners secured a temporary injunction to prohibit the occupancy of the house by a group of mentally retarded persons.

At the hearing on the permanent injunction some of the homeowners elaborated upon the character of the subdivision.[4] There was testimony that placement of the group home in the neighborhood would create problems of traffic congestion and lead to a decrease in property values of the surrounding lots. Two neighbors testified that Williams' daughter was an annoyance and a nuisance at times.[5]

The trial court issued a permanent injunction upon its finding that the proposed use of the house was incompatible with the restrictive covenants and zoning ordinances.[6]

---

1. The five young women are classified as "mildly retarded." Testimony indicated that they had mental capacities ranging from the age of eight to twelve.

2. The housekeeper was not expected to have medical or specialized training.

3. Allegations made in the homeowners' petition that the Oklahoma Department of Human Services was involved in this venture were not substantiated by evidence.

4. The homeowners believed that the house would be more like a dormitory than a residence if the group home were allowed to be established in their neighborhood. They also considered the addition of a fire escape ladder on the back of the house as an unattractive appendage.
   The remodeling of the house consisted of adding a full bath, three clothes closets, a fire escape and a second door. The latter two were added onto the rear of the house.

5. Williams' daughter was deemed to be a nuisance by the neighbors because she interrupted conversations, talked "non-stop," "stood in the street" and "wandered the neighborhood at all hours."

6. The trial judge identified several factors which he considered in reaching the conclusion that the proposed group home was an impermissible use of the property: (1) the payment of rent for room and board to the Association by five unrelated individuals; (2) the payment of rent by an association to a family trust; (3) there would be transient types of residents inhabiting the Williams home for six months up to an indefinite number of years; (4) the presence of Williams' daughter in her parents' home for a continuous period would not give any certainty of the intended permanence of the other residents or even of Williams' daughter; (5) the home would be operated by the board of a non-profit organization rather than by the head of a household; (6) the parties would be totally unrelated, contrary to the definition of the term "family" which the neighbors, residents, and landowners understood the word to mean when they bought their property; (7) there would be hired help on the premises on an alternative basis to provide housekeeping, collection of rent, recreation and guidance; (8) the girls who would be living in the home were in their twenties and would need guidance above and beyond normal guidance needed for persons of the same age; (9) there would be one or two of the girls working full time and the rest would have part-time or negligible employment requiring outside help to provide for their necessities and sustenance of life; (10) the local zoning ordinances and state statutes may be circumvented by the proffered housing procedure because licensing might be

## I

### INJUNCTIVE RELIEF

Williams seeks appellate relief on the ground that the proposed use of the home is permitted by the local zoning laws and applicable restrictive covenants. The homeowners characterize the proposed use of the home as institutional and thus prohibited in the area.

During the proceedings in the trial court the homeowners asserted that the following zoning laws and restrictive covenants would be violated by the maintenance of a group home:

(1) The Park Plaza South III subdivision is a RS–3 zoning district which means that it is a residential, single-family high-density district.[7]

(2) Covenant A of the subdivision's deed of dedication requires that all lots in the tract shall be known and described as residential lots. It further provides that no structure shall be erected, altered, placed or permitted to remain on any building lot other than a detached "single-family dwelling."

(3) Covenant E provides that no noxious or offensive trade or activity shall be carried on upon any lot nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.

The trial court granted injunctive relief based on violations of these provisions.

The award of a permanent injunction is a matter of equitable cognizance. On review of an equity case we are bound neither by the reasoning of the trial court nor by its findings but may examine the whole record and consider and weigh all the evidence.[8] The findings and decree of the trial court will not be disturbed unless found to be clearly against the weight of the evidence.[9] An injunction is an extraordinary remedy and relief by this means is not to be granted lightly.[10] The right to injunctive relief must be established by clear and convincing evidence and the nature of the injury must not be nominal, theoretical or speculative.[11]

## II

### THE ZONING ORDINANCE

Zoning ordinances are to be strictly construed and not extended by implication. Any ambiguity or uncertainty should be decided in favor of the property owner whose use of the premises, actual or proposed, is in contest.[12]

The Park Plaza South III addition is zoned as a residential single-family high density district.[13] These districts are:[14]

"... designed to permit the development and conservation of single-family detached dwellings in suitable environments in a variety of densities to meet the varying requirements of families."

needed; (11) the visitation by family and friends would cause an appreciable increase in traffic above the norm for houses in the neighborhood; and (12) the planning commission and the city commission were not involved in the proposed housing arrangement.

7. Charter and Revised Ordinances of the City of Tulsa, Oklahoma, Title § 42 (Zoning and Property Restrictions), Ch. 2 § 200 [February 1, 1978].

8. *Public Service Company of Oklahoma v. Home Builders Association of Realtors, Inc.,* Okl., 554 P.2d 1181, 1184 [1976].

9. *Johnson v. Ward,* Okl., 541 P.2d 182, 188 [1975].

10. *Amoco Production Co. v. Lindley,* Okl., 609 P.2d 733, 745 [1980] and *Johnson v. Ward, supra* note 9 at 188.

11. *Sunray Oil Co. v. Cortez Oil Co.,* Okl., 112 P.2d 792, 796 [1941] and *Thomas v. Hampton,* Okl., 583 P.2d 506, 507 [1978].

12. *Cauvel v. City of Tulsa,* Okl., 368 P.2d 660, 661 [1962].

13. Charter and Revised Ordinances of the City of Tulsa, Oklahoma, Title § 42, Ch. 2 § 200 [February 1, 1978].

14. Charter and Revised Ordinances of the City of Tulsa, Oklahoma, Title § 42, Ch. 4 § 400.2 [February 1, 1975].

■ The zoning code requires that it be interpreted by resorting to the definitions set out in Chapter 18.[15] A *"single-family"* dwelling is defined as:

"A building, other than a mobile home, containing one dwelling unit designed for occupancy by not more than one family."

The term *"family"* is defined as:

"One or more persons occupying a single dwelling unit, provided that unless all members are related by blood, marriage, or adoption, *no such family shall contain over five persons*, but further provided that domestic servants may be housed on the premises without being designated as a family." [Emphasis added].

The district court's ruling on this issue was clearly contrary to the plain wording of the ordinance. Where, as here, the zoning law has expressly defined the meaning of the term "family," the stated definition is controlling.[16] The proposed use of the home as a residence for five unrelated mentally handicapped persons and one housekeeper would clearly bring the group home within the terms of the zoning laws.

■ The ordinance does not require, as suggested by the homeowners, that all who live in the house own it jointly, nor can this requirement be fairly implied within its terms. The district court was concerned that Williams had not applied for a variance from the zoning commission. Since occupancy of Williams' home by five persons unrelated to one another and their housekeeper is permitted by the zoning ordinance, there was no need for Williams to seek a variance.

**15.** Charter and Revised Ordinances of the City of Tulsa, Oklahoma, Title § 42, Ch. 18 § 1800 (Definitions) [February 1, 1975].

**16.** *Dolese Bros. Co. v. Privett*, Okl., 622 P.2d 1080, 1084 [1981]; *See also Oliver v. Zoning Commission of Town of Chester*, 31 Conn.Supp. 197, 326 A.2d 841, 845 [1974]; *Carroll v. City of Miami Beach*, 198 So.2d 643, 645 [Fla.App.1967]; and *Linn County v. City of Hiawatha*, 311 N.W.2d 95, 99 [Iowa 1981].

**17.** *Public Service Company of Oklahoma v. Home Builders Association of Realtors, Inc., su-*

## III

### THE RESTRICTIVE COVENANTS

The specific restrictive covenants that are at issue in the instant case provide:

Covenant A

"All lots in the tract shall be known and described as *residential lots*. No structure shall be erected, altered, placed or permitted to remain on any building plot, that exceeds two stories in height; all residences must have a private garage, for not less than two cars, attached to the residence. All structures shall be constructed of brick or stone veneer at least window-sill height all the way around with the exception of porches and terraces and garages. No structure shall be erected, altered, placed or permitted to remain on any building plot other than one detached *single-family dwelling*." [Emphasis added].

Covenant E

"No noxious or offensive trade or activity shall be carried on upon any lot nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood."

We begin our analysis with a fundamental premise of the law of real property. While the intentions of the parties to restrictive covenants ordinarily control the construction of the covenants, such covenants are not favored by the law and they will be strictly construed to the end that all ambiguities will be resolved in favor of the unencumbered use of the property.[17]

Covenant A sets forth both a *use* and a *structural* restriction.[18] The first sentence in Covenant A requires the lots to be *resi-*

*pra note 8 at 1185 and Pirtle v. Wade*, Okl.App., 593 P.2d 1098, 1099–1100 [1979]; *See also Knudtson v. Trainor*, 216 Neb. 653, 345 N.W.2d 4, 6 [1984] and *J.T. Hobby & Son, Inc. v. Family Homes of Wake County, Inc.*, 302 N.C. 64, 274 S.E. 174, 179 [1981].

**18.** For cases that discuss the difference between a *use* and a *structural* restriction, see *J.T. Hobby & Son, Inc. v. Family Homes of Wake County, Inc., supra* note 17 at 180–182 and *Knudtson v. Trainor, supra* note 17 at 6 and 7.

*dential;* the rest of the covenant requires that any structure be a *single-family* dwelling.

■ The homeowners argue that the maintenance of a group home is not a residential use but necessarily a commercial one because the Association will receive financial remuneration from the residents and will hire a housekeeper to supervise the residents. Although the commercial nature of a group may have some relevance, that characteristic is not determinative in this case. It is the *purpose* and *method of operation* which serves to distinguish the proposed residential use of the home from that normally incident to a purely commercial operation. Financial gain is clearly not the motivation of the Association in the operation of the home.

The five women are to function as a single housekeeping unit by sharing in the preparation of meals, performing housekeeping duties and planning recreational activities. Most of the women have outside employment. The housekeeper will provide supervision and guidance similar to that of the head of any household. The day-to-day activities occurring at the home, as viewed from the outside, will not make it appear unlike the rest of the neighborhood. The essential purpose of the group home is to create a normal family atmosphere dissimilar from that found in traditional institutional care for the mentally handicapped. The operation of a group home is thus distinguishable from a use that is commercial—i.e., a boarding house that provides food and lodging only—or is institutional in character.[19] Furthermore, no educational training would be provided at the home nor would there be medical or nursing care administered to the residents.[20] In virtually all respects, save for the mental capacity of those who would live in the home, the on-the-premises operations would be much like a typical suburban household.

The homeowners' reliance on Garcia v. Siffrin Residential Assn.[21] is misplaced. *Garcia* dealt with the establishment of a residential treatment facility for mentally retarded persons. Training and education are the primary purpose of a treatment facility or an institution, whereas providing a family atmosphere is the primary purpose of a group home.

■ The second portion of Covenant A imposes a structural requirement on the owners in the tract to limit building size and style. The homeowners argue that this covenant was violated by the addition of three closets, a full bathroom, a second rear door and a fire ladder at the rear of the house. There is nothing in the record to indicate how these alterations make this house any different from one used by the typical American suburban family. Courts in other jurisdictions have found group homes such as this one in compliance with similarly worded restrictive covenants.[22]

Oklahoma case law has not addressed itself to the meaning of the phrase "single-family dwelling" in the context of a restrictive covenant. The trial court noted that the residents of the group home would be unrelated and that this would be contrary to the definition of "family," which word the homeowners understood when they purchased the property to mean persons related by consanguinity or affinity. It

19. If the evidence had shown that the home was to be used for education and training or medical and nursing care—i.e., a use that is more institutional in nature—we would have reached an opposite result. See *J.T. Hobby & Son, Inc. v. Family Homes of Wake County, Inc., supra* note 17 at 181 and *Costley v. Caromin House, Inc.,* 313 N.W.2d 21, 25 [Minn.1981].

20. *Costley v. Caromin House, Inc., supra* note 19 at 25.

21. 63 Ohio St.2d 259, 407 N.E.2d 1369 [1980].

22. *Linn County v. City of Hiawatha, supra* note 16; *Concord Estates Homeowners Association Inc. v. Special Children's Foundation, Inc.,* 459 So.2d 1242 [La.App.1st Cir.1984]; *Leland Acres Home Owners Association, Inc. v. R.T. Partnership,* 106 Mich.App. 790, 308 N.W.2d 648 [1981]; *Malcolm v. Shamie,* 95 Mich.App. 132, 290 N.W.2d 101 [1980]; *Costley v. Caromin House, Inc., supra* note 19; *Knudtson v. Trainor, supra* note 17; *J.T. Hobby & Son, Inc. v. Family Homes of Wake County, Inc., supra* note 17 and *Crowley v. Knapp,* 94 Wis.2d 421, 288 N.W.2d 815 [1980]; but see cases cited in footnote 23 *infra.*

seems clear from a casual reading of the covenant that its drafter did not intend to define "family" in that manner. The term "family" was, in fact, used without a definition and hence did not necessarily exclude from its meaning a group of unrelated persons living together in a home.[23] This phrase was intended to describe the character of the *structure* rather than limit the *use* of the property to a single-family residence. When, as here, the restrictive covenant under consideration prohibits occupancy of more than one family unit but does not address itself to the composition of the family, a court is loathe to restrict a family unit to that composed of persons who are related, one to another, by consanguinity or affinity.[24]

23. We reject the reasoning of jurisdictions which have reached a contrary result. See *Omega Corp. of Chesterfield v. Malloy,* 228 Va. 12, 319 S.E.2d 728 [1984]; *London v. Handicapped Facilities Board of St. Charles County,* 637 S.W.2d 212 [Mo.App.1982]; and *Shaver v. Hunter,* 626 S.W.2d 574 [Tex.App.1981].

[1] In *Omega* the building was restricted to a *residential* use and *structurally* to a "single-family dwelling." The court held that when the element of supervision is added to the occupancy of unrelated persons the single-family use is destroyed.

[2] In *London* the court held that the term "family" in a deed of dedication—where the word is not defined—was intended to refer to the more traditional definition of that term; i.e., "persons related by blood, marriage or adoption." The court did not believe that a group home of four mentally handicapped persons, supervised by a married couple, met this definition of a family.

The "traditional family" is distinguishable from its less restrictive definitions of (a) "nuclear family"—i.e., one that consists of parents, children and domestic servants; *Rudy v. Southampton Civic Club,* 271 S.W.2d 431 [Civ.App.1954] or (b) "extended family"—i.e., one that consists of a nucleus group of persons related by blood, marriage or adoption which may include parents, children and other kinsmen more remotely related such as grandchildren, uncles, aunts, nieces and the like and even lodgers or boarders. *Shaver, supra,* 626 S.W.2d at 577 and 578 and *Southampton Civic Club v. Couch,* 159 Tex. 464, 322 S.W.2d 516, 518 [1959].

[3] In *Shaver* a covenant restricted the *use* of the home to a residential purpose and a single-family dwelling. There was no *structural* restriction in the covenant. *Shaver* relied upon the "extended family" definition for the term "single-family dwelling" and concluded that the defendant had violated the covenant by allowing his home to be used by a non-profit corporation as a group home for severely handicapped persons.

*Shaver* is factually distinguishable from the present case. This is so because here (a) the single-family dwelling restriction *was not included* in the definition of residential purpose and (b) *only a structural restriction* limited the building size and style to a single-family dwelling. *Nowhere in the covenant at issue here was the use of the building restricted to a single family dwelling.* The court in *Shaver* acknowledged that in some jurisdictions the courts refuse to enjoin group home living arrangements when the covenant restricts the *form or character* of the structure *only* rather than limiting the use of the property to a single-family residence. The concurring opinion in *Shaver* stated that the *extended family* definition was "unrealistic and unduly restrictive" because, consistent with well-reasoned authorities in other jurisdictions, it was preferable *"to define 'family' as a stable housekeeping unit of two or more persons who are emotionally attached to each other and share a relationship that emulates traditional family values, promotes mutual protection, support, happiness, physical well-being and intellectual growth and is not in violation of the penal laws."* [Emphasis added.] *Id.,* 626 S.W.2d at 579. Under this proposed definition, the housemother and her three charges would have been permitted to remain in the dwelling.

24. *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 [1948], must be considered when examining the constitutional impact of restrictive covenants. There, the Court invalidated a private restrictive covenant that discriminated on the basis of race because judicial enforcement of the covenant would constitute state action within the meaning of the 14th Amendment. Under *Shelley v. Kraemer* the machinery of government may not be invoked to enforce the restrictive covenants that are violative of fundamental constitutional rights.

In *City of Cleburne, Texas v. Cleburne Living Center, Inc.,* 473 U.S. ——, 105 S.Ct. 3249, 87 L.Ed.2d 313 [1985], a suit was brought by the Cleburne Living Center [CLC] challenging the validity of a zoning ordinance that required a special use permit for a group home for mentally retarded persons and, as applied in *Cleburne,* operated to exclude the group home in an area that was zoned for high-density apartment use which included boarding houses, hospitals, nursing homes, etc. The permit would not have been necessary *but for* the composition of the group home members as mentally retarded persons. Holding that mental retardation is not a quasi-suspect classification calling for a more exacting standard of judicial review, the Court

██ In considering violations of Covenant E—which prohibits noxious or offensive activities or activities that create a nuisance or an annoyance—the trial court did not specifically identify the factors it deemed violative of this covenant.

If Covenant E were interpreted to prohibit all commercial activity, maintenance of the group home would still be a permitted use under the same reasoning as that discussed under Covenant A.

Other factors that may have been considered by the trial court in finding a violation of Covenant E are the possibility of increased traffic in the neighborhood or that the women in the home would require more guidance than other women of their age. No evidence was introduced to prove that traffic in the neighborhood would increase because of the maintenance of a group home. We may infer here from the evidence that the behavior of a mentally handicapped adult is not unlike that of a child. In the absence of contrary proof, we are constrained to hold that the service personnel needed to assist in the care of these women would not constitute a nuisance in the subdivision, nor would the occupancy of Williams' home by five mildly-retarded persons amount to an annoyance or a nuisance per se. We find that the trial court's ruling here is clearly against the weight of the evidence.

██ Lastly, Williams requests that he be allowed an attorney's fee but cites no authority for its award in the litigation category into which this action falls.[25] As a general rule, attorney's fees are not recoverable by a prevailing party in the absence of a statute or an enforceable contract.[26] Since we are aware of no authority for a counsel fee allowance in an injunction suit like the one before us the plea must be denied.

In summary, we conclude that (a) a group home for five mentally handicapped persons and one housekeeper is a single-family unit within the meaning of the city zoning ordinance; (b) there is an absence in Covenant A of a *restriction* upon the *use* of the house for a single-family dwelling; the only *use limit* present in that covenant confines the home to a *residential purpose;* (c) the single-family restriction in Covenant A is *purely structural;* it does not restrict the *use* of the house; the structural covenant is not offended because *none* of the alterations made in the house operates to change the character of the structure as a single-family dwelling; and (e) the operation of the group home would not violate the restriction in Covenant E

determined the ordinance to be invalid as applied, because the record did not reveal any *rational basis* for believing that the home for the mentally retarded would pose any special threat to the city's legitimate interests.

Marshall, J., in his concurring in judgment opinion, stated that the right to "establish a home" has long been cherished as one of the fundamental liberties embraced by the Due Process Clause and that for retarded adults this means living together in group homes. *Cleburne, supra,* 105 S.Ct. at 3266. He noted that the 14th Amendment prohibits discriminatory classifications created by law along racial or ethnic lines, citing to *Shelley v. Kraemer,* and that it significantly constrains the range of permissible government choices where gender or illegitimacy are concerned. He disagreed with the Court's choice of a "rational basis" standard and urged that where such constraints, derived from the 14th Amendment, are present and where history teaches that they have systemically been ignored, a more searching judicial inquiry—i.e., heightened scrutiny—is required. *Id.* 105 S.Ct. at 3271.

While the U.S. Supreme Court does not appear to have expanded its holding in *Shelley v. Kraemer* beyond restrictive covenants having racial overtones, other state courts have applied *Shelley* in contexts other than racial discrimination. See *Riley v. Stoves,* 22 Ariz.App. 223, 526 P.2d 747 [1974] (restrictive covenant that excluded families with children); *Franklin v. White Egret Condominium,* 358 So.2d 1084 [Fla. App.1978] (discriminating on the basis of age) and *West Hill Baptist Church v. Abbate,* 23 Ohio Misc. 66, 261 N.E.2d 196 [1969] (religious use of property).

Should we narrowly interpret the one-family dwelling restrictions so as to prohibit unmarried persons from living together in a common household as a family, the protections of *Shelley v. Kraemer* might well be invoked as a constitutional bar to enforcement of the covenant.

25. Williams cites us to *Kiddy v. City of Oklahoma City,* Okl., 576 P.2d 298, 301 [1978]. The case does not support his claim to counsel fees.

26. *Garner v. City of Tulsa,* Okl., 651 P.2d 1325, 1329 [1982].

against noxious or offensive trade or activity.

The decree allowing injunctive relief against Williams is reversed; the cause is remanded with directions to dissolve the injunction, render judgment for the defendants and retax costs in conformity to this pronouncement.[27]

SIMMS, C.J., DOOLIN, V.C.J., and LAVENDER, HARGRAVE, KAUGER and SUMMERS, JJ., concur.

ALMA WILSON, J., concurs in part and dissents in part.

HODGES, J., dissents.

ALMA WILSON, Justice, dissenting in part and concurring in part.

I am in agreement with the majority opinion on question (1). The use of the residence as a group home for five mentally retarded women and their housekeeper constitutes a "single-family dwelling" within the meaning of the Tulsa zoning ordinance. If this case were based on the zoning ordinance alone, the trial court's injunction would be improper. I also concur with the majority's determination on issue (3).

However, I disagree with the majority on issue (2). The Appellees in this case have a legally protected contractual right which has been infringed. The group home violates the applicable restrictive covenant limiting the use of the property covered by the contract to "single-family dwellings".

The intentions of parties who voluntarily enter into a restrictive covenant control judicial construction of the covenant. The majority superimposes the zoning ordinance's definition of "single-family dwell-ing" onto the restrictive covenant of private parties. The zoning ordinance reflects the policy choice of the city of Tulsa, while the private restrictive covenant reflects differing policy choices. Nothing in the zoning ordinance indicates that definitions stated in the ordinances control private contracts of individual parties. Likewise, nothing in the restrictive covenants or deeds provide for the definitions of the zoning ordinance to control.

The term "single-family dwelling" should therefore be interpreted from the document itself. This calls for an examination of the plain and obvious purpose of the restriction and the ordinary meaning of the terms used. It is my opinion that the restrictive covenant's usage of the term "single-family dwelling" refers to more traditional definition of a nuclear or extended family sharing one household.

The majority opens the door to selective enforcement of restrictive covenants. In effect, restrictive covenants can be enforced against all non-single family residence uses *except* when living arrangements include mentally handicapped persons. Although this reasoning reaches a desirable and preferred result, equal protection principles forbid selective enforcement of restrictive covenants.[1] The Appellants seeking relief voluntarily agreed by contract that the use of the property would be limited to a "single-family dwelling". I would uphold the restrictive covenant and affirm.

---

27. This opinion does not address the issues of (a) whether a license is required for the proposed group home by the Room and Board Home Care Act, Okla.Sess.L. 1984, Ch. 128 § 1 et seq., eff. November 1, 1984 [63 O.S.Supp.1984 § 1–819 et seq.] or (b) how a license requirement, if applicable, would affect the controversy in contest. Neither of these issues was pressed upon us in the briefs.

1. I find persuasive the reasoning of courts that have held contrary to the majority's analysis. *See, e.g., Omega Corporation of Chesterfield v. Malloy*, 228 Va. 12, 319 S.E.2d 728 (1984) *cert den* — U.S. ——, 105 S.Ct. 967, 83 L.Ed.2d 971 (1985); *London v. Handicapped Facilities Board of St. Charles County*, 637 S.W.2d 212 (Mo.App. 1982); *Shaver v. Hunter*, 626 S.W.2d 574 (Tex. App.1981) *cert. den* 459 U.S. 1016, 103 S.Ct. 377, 74 L.Ed.2d 510 (1982).