# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CA-00525-SCT

*SCIOTO PROPERTIES SP-16, LLC, AND*
*BRANDI'S HOPE COMMUNITY SERVICES, LLC*

*v.*

*ANDY GRAF AND SHERYL GRAF*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/01/2020 |
| TRIAL JUDGE: | HON. JACQUELINE ESTES MASK |
| TRIAL COURT ATTORNEYS: | MICHAEL B. GRATZ, JR. |
| | MARGARET SAMS GRATZ |
| | WILLIAM HOLCOMB HUSSEY |
| | ELLIOTT VAUN HALLER |
| | MARJORIE SELBY SELF |
| COURT FROM WHICH APPEALED: | LEE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | MARJORIE SELBY SELF |
| | WILLIAM HOLCOMB HUSSEY |
| ATTORNEYS FOR APPELLEES: | MARGARET SAMS GRATZ |
| | MICHAEL B. GRATZ, JR. |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 10/13/2022 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., MAXWELL AND GRIFFIS, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.    The issue in this appeal is straightforward—does Brandi's Hope Community Services,

LLC, a for-profit business that provides residential support services and leases a home in The

Grove subdivision in Tupelo, use the home commercially in violation of The Grove's

protective covenants?

¶2.   To answer this question, Brandi's Hope asks this Court to focus on how its sublessees—four disabled men—use the home as their residence. And it insists the fact these men receive round-the-clock residential support services from Brandi's Hope does not change the residential character of the men's use.

¶3.   But under the undisputed facts, Brandi's Hope does not merely come to the home to provide services. Brandi's Hope is a business that *leases* the home for the express purpose of providing residential home services for which it is paid. Further, the sublease with the tenants *requires* each man to exclusively use Brandi's Hope as their residential-support-services provider. And should they choose to terminate Brandi's Hope's services, they can no longer live in the home.

¶4.   In other words, any residential use by the sublessees is conditioned on and preceded by Brandi's Hope's commercial use of the property—and not the other way around. Thus, the chancery court did not err by declaring that Brandi's Hope's commercial use violated the clear and unambiguous intent of the protective covenants. We affirm.

### The Protective Covenants

¶5.   In 2016, Scioto Properties SP-16, LLC, purchased the residence on Lot 62 in The Grove. Scioto is a for-profit limited-liability company based in Ohio. Scioto specializes in helping individuals with developmental and/or physical disabilities to find residential housing. Under the express terms of the warranty deed, Scioto agreed to abide by any and all protective covenants.

2

¶6. Mississippi courts generally do not favor covenants restricting the use of real property, which "are subject more or less to a strict construction[.]" ***Kemp v. Lake Serene Prop. Owners Ass'n, Inc.***, 256 So. 2d 924, 926 (Miss. 1971), *abrogated on other grounds by* ***Tideway Oil Programs, Inc. v. Serio***, 431 So. 2d 454 (Miss. 1983). But neither will courts disregard the clear and unambiguous working of a restrictive covenant "merely because a use is prohibited or restricted." ***Andrews v. Lake Serene Prop. Owners Ass'n***, 434 So. 2d 1328, 1331 (Miss. 1983). "If the intent to prohibit or restrict [is] expressed in clear and unambiguous wording, enforcement is available in the courts of this state." ***Id.***

¶7. Here, the covenants clearly and unambiguously express the intent to prohibit commercial use of the property. It is clearly not allowed:

> Only one single family residence shall be constructed or permitted on each lot and it shall be used for *residence* purposes only.
>
> The term "residence purposes" shall generally be defined as single family homes, and *shall exclude all commercial and professional uses*, and among other things, garage apartments, apartment houses, duplex and multi-family residences, profit or non-profit, *nursing homes, hospitals and other similar private or charitable enterprises*, and any and all such usages of this property is hereby expressly prohibited.

(Emphasis added.)

### The Lease and Sublease

¶8. Despite the covenants' clear prohibition of commercial and professional use, Scioto leased the home on Lot 62 to Brandi's Hope in June 2017. Brandi's Hope is a for-profit Mississippi limited-liability company that provides services to individuals with developmental and/or physical disabilities. A condition of the lease with Scioto was that

3

Brandi's Hope agreed to use the home on Lot 62 "solely to provide residential support services" to the residents living in the home.

¶9.   In October 2017, Brandi's Hope entered into four separate subleases with four individuals. These subleases were for separate private bedrooms within the house along with the right to use the common areas of the house.

¶10.   As a condition of living in the home, each disabled individual agreed to exclusively use Brandi's Hope's residential support services. These services include helping these men dress, maintain proper hygiene, and prepare meals. While no Brandi's Hope employee lives with the clients, Brandi's Hope employees provided around-the-clock care, taking turns tending to clients overnight. Brandi's Hope is compensated for its services by the Mississippi Department of Medicaid.

¶11.   While the subleases "acknowledge[d] that all individuals have a choice in the provider of all services, including residential support services, and that [sublessees] may choose to terminate the provision of residential support services by Brandi's Hope Community Services, LLC at any time," the subleases expressly "provided that this Agreement and any occupancy and use rights in and of these premises *shall be terminated* effective upon the termination of residential support services provided by Brandi's Hope Community Services, LLC." (Emphasis added.)

¶12.   In short, the men were required to use Brandi's Hope to live in the home.

**The Declaratory Judgment Action**

4

¶13. Soon after the four individuals moved in, the owners of the residence directly across the street, Andy and Sheryl Graf, filed a complaint in the Chancery Court of Lee County against Scioto and Brandi's Hope.[1] The Grafs alleged the residence on Lot 62 was being used for business purposes, which violated the protective covenants. The Grafs sought a declaratory judgment and injunctive relief.

¶14. Notably, the Grafs did not name the individuals subleasing rooms from Brandi's Hope as defendants. And none have participated in this litigation.

¶15. Something else that is *not* part of this litigation is Brandi's Hope claim that the Grafs' enforcement action violates the Federal Fair Housing Act (FHA). Instead of raising an FHA defense to the Grafs' chancery-court complaint, Brandi's Hope elected to file a separate action in federal court. ***Brandi's Hope Cmty. Servs., LLC v. Graf***, No. 1:18-CV-00022-NBB-RP, 2018 WL 3520126 (N.D. Miss. July 20, 2018). That federal litigation has been stayed pending completion of this state-court case. ***Id.*** at *3.

¶16. Thus, the only issue before the chancery court was whether Scioto and Brandi's Hope's use of the property violated the protective covenant expressly prohibiting commercial use.

¶17. Scioto and Brandi's Hope sought summary judgment on this issue, which the chancery court denied following a hearing.

---

[1] The Grove Subdivision Homeowners Association, LLC, joined the Grafs in the complaint. But after its attorney, who also represented the Grafs, withdrew her representation of the homeowners association due to a conflict of interest, the homeowners association never sought new counsel or otherwise participated in this litigation.

The City of Tupelo was also named as a defendant but was soon dismissed.

5

¶18. The Grafs, Scioto, and Brandi's Hope then submitted to the chancery court a joint stipulation of facts. Based on this additional evidence, the Grafs renewed their request for a declaratory judgment. And the chancery court, having been advised no further hearing was necessary, granted their motion.

¶19. The chancellor concluded Scioto's and Brandi's Hope's use of the property was commercial and thus prohibited by the protective covenants. The chancery court was persuaded by the terms of lease between Scioto and Brandi's Hope, which contemplated Brandi's Hope would conduct its business in the residence. It considered the lease in conjunction with the subleases between Brandi's Hope and the four individuals, which required these individuals to use Brandi's Hope as their exclusive round-the-clock service provider. Further, the joint stipulation of facts established Brandi's Hope had in fact been conducting the activities in the home for its sublessees as contemplated by the lease with Scioto. Specifically, the chancery court concluded that it was "[t]he merging of the foregoing arrangements and activity [that] falls within the expressly prohibited uses of property within The Grove."

### Scope of Appeal and Standard of Review

¶20. Scioto and Brandi's Hope have appealed both the order denying their motion for summary judgment and the final order entering a declaratory judgment in favor of the Grafs. But the only reviewable ruling before this Court is the grant of the declaratory judgment.

¶21. Recently, this Court "adopt[ed] the general rule that, once a case has been tried, a pretrial order denying summary judgment will not be reviewed on appeal." *City of Jackson*

6

*v. Johnson*, 343 So. 3d 356, 367 (Miss. 2022). Here, there was no subsequent trial. But the parties did submit additional evidence to the chancellor before asking her to make a final ruling. So *Johnson*'s principle applies. This Court will not review "two different sets of evidence"—the evidence presented to the trial court when it denied the motion for summary judgment and the evidence presented at trial. ***Id.*** (quoting ***Franklin Collection Serv. Inc. v. Collins***, 206 So. 3d 1282, 1284 (Miss. Ct. App. 2016)). Instead, "[w]hen in due course the final trial is had on the merits it becomes the best test of the rights of the movant." ***Id.*** (quoting ***Collins***, 206 So. 3d at 1285).

¶22.    For this reason, we address only Scioto and Brandi's Hope's claim that the chancellor erred by granting the Grafs' motion for declaratory judgment. We review that ruling de novo. ***Pre-Paid Legal Servs. v. Battle***, 873 So. 2d 79, 82 (Miss. 2004).

**Discussion**

¶23.    In addressing Scioto and Brandi's Hope's claim, we begin by emphasizing what this case is *not* about.

¶24.    First, this case is not about whether four unrelated disabled men living in a house together meets the definition of a "single-family home." Scioto and Brandi's Hope claim the chancellor erroneously ignored several cases from other jurisdictions that have concluded such an arrangement does not violate single-family home restrictions.[2] But the Grafs have

---

[2] *E.g.*, ***Linn Cnty. v. City of Hiawatha***, 311 N.W.2d 95 (Iowa 1981); ***Costley v. Caromin House, Inc.***, 313 N.W.2d 21 (Minn. 1981); ***City of White Plains v. Faraioli***, 313 N.E.2d 756 (N.Y. 1974).

7

never argued the four men's living in the home *per se* violated the single-family-home requirement. So these cases provide no persuasive guidance.

¶25. Second, this case is not about public policy. Specifically, this case is not about whether the chancery court's enforcement of the clear and unambiguous language in the covenants violates the Federal Fair Housing Act (FHA). And the reason for this is simple. Brandi's Hope *chose* not to raise the FHA as a defense to the Grafs' declaratory action. Instead, they asserted an FHA defense in separate federal litigation. And that federal case has been stayed pending the outcome of this case. ***Brandi's Hope Cmty. Servs., LLC***, 2018 WL 3520126, at *3.

¶26. Still, in their briefs, Scioto and Brandi's Hope try to make an end-run around their chosen litigation strategy. They cite cases from other jurisdictions that in turn relied on the FHA and argue the chancery court erred by not following the public policy expressed in those cases. *E.g.*, ***Rhodes v. Palmetto Pathway Homes, Inc.***, 400 S.E.2d 484 (S.C. 1991). But the chancellor did not err by not considering cases that rely on a defense not placed before her.[3] Instead, the chancellor rightly focused on the sole issue presented—whether, based on the clear and unambiguous language of the covenants, Scioto and Brandi's Hope's use of property was commercial and professional and thus prohibited.

---

[3] We note that Scioto and Brandi's Hope also cite several out-of-state cases that rely on express legislative policy codified in those states' statutes. *E.g.*, ***Double D Manor, Inc. v. Evergreen Meadows Homeowners' Ass'n***, 773 P.2d 1046, 1051 (Colo. 1989); ***Clark v. Manuel***, 436 So. 2d 1276, 1281 (La. 1985). We fail to see how the chancellor could have erred by not following those cases when Scioto and Brandi's Hope concede that the Mississippi legislature has not enacted any similar policy.

¶27.    After a de novo review, we affirm the chancery court's declaratory judgment that Brandi's Hope's use of the residence on Lot 62 violated the protective covenant prohibiting "all commercial and professional uses" of properties within The Grove.

## I.    The Terms of the Lease and Subleases

¶28.    On appeal, Scioto and Brandi's Hope argue that the chancery court erred by relying on the lease and subleases. Because the protective covenants do not prohibit leases or subleases, they argue the existence of the lease and sublease cannot be considered as violations of the protective covenants. But the chancellor did not rely on the mere *existence* of the lease and sublease to conclude the protective covenants had been violated. The chancellor relied on the *specific terms* of the lease and sublease, which tethered Brandi's Hope's right to lease the property and the tenants' right to live in the property to Brandi's Hope providing residential support services. In other words, it is not the lease and sublease *per se* that violate the covenants. Rather, both the lease and sublease are relevant to the question of how the property is being used—especially because the stipulated facts established that the property has in fact been used consistent with the terms of the lease and subleases.

¶29.    Brandi's Hope is a for-profit business. And this business is to make money by providing residential support services. An express condition of its lease with property owner Scioto is that Brandi's Hope use the premises to provide residential support services. So it is clear Brandi's Hope leased Scioto's property for commercial use. In turn, Brandi's Hope subleases the property to individuals with disabilities. They do this in exchange for not only

9

rent but also an exclusive residential support-services contract for which Brandi's Hope receives compensation. In fact, under the terms of these subleases, continued residence at the property by the sublessees is *expressly tied* to continued use of Brandi's Hope's services, for which the business is compensated. So there is no residential use without Brandi's Hope's prohibited commercial use of the property.

## II. The Services Provided

¶30. Next, Scioto and Brandi's Hope assert the chancellor ignored a "mountain of precedent from other states that pointed firmly towards finding that the use of [the residence on Lot 62] is determined by the residents living there, and not by any services they receive." But this argument misconstrues the chancellor's determination. The chancellor did not base her ruling on the fact that disabled individuals subletting the home receive residential support services—she based her ruling on the fact the provision of the services *precedes* and is a condition of any residential use.

¶31. Undoubtedly, many if not all of the residents in The Grove receive some type of commercial or professional services at their homes, such as cleaning, yard maintenance, catering, babysitting, nursing, hospice care, etc. And none of these services alter the residential character of their use of the property. But under the unique facts of this case, the four disabled men subletting rooms do not merely receive services at their home. Instead, what Brandi's Hope provides is round-the-clock services *as an express condition* of any residence. As Brandi's Hope's chief executive officer testified, if their tenants "accept our services, they're also accepting the home. So, in essence, they're tied."

10

¶32. This is an important distinction between this case and the out-of-state cases Scioto and Brandi's Hope rely on concerning group homes. In those cases, the homes were leased by nonprofit organizations that organized and managed the group homes, by collecting rent from the disabled men or women living in the homes and arranging for residential support services if needed. *E.g.*, ***Rhodes***, 400 S.E.2d 484; ***Blevins v. Barry-Lawrence Cnty. Ass'n for Retarded Citizens***, 707 S.W.2d 407 (Mo. 1986); ***Jackson v. Williams***, 714 P.2d 1017 (Okla. 1985); ***Knudtson v. Trainor***, 345 N.W.2d 4 (Neb. 1984). While neighboring homeowners claimed these activities were commercial, the respective courts in those cases disagreed. ***Rhodes***, 400 S.E.2d at 485-85; ***Blevins***, 707 S.W.2d at 407-08; ***Jackson***, 714 P.2d at 1022; ***Knudtson***, 345 N.W.2d at 5. Those courts focused on the particular "*purpose* and *method of operation*" of the groups homes, which "distinguish[ed] the proposed residential use of the [group] home from that normally incident to a purely commercial operation." ***Jackson***, 714 P.2d at 1022. One home was permitted as residential because "[f]inancial gain [wa]s clearly not the motivation" of the nonprofit operating the home. ***Id.*** Another court ruled that merely establishing a home that "serves as a surrogate family arrangement" involved "no commercial enterprise." ***Blevins***, 707 S.W.2d at 408. And yet another noted, "[n]o evidence was introduced that could support a finding that the proposed use of the residence as a group home involved the operation of a business or commercial enterprise[.]" ***Knudtson***, 345 N.W.2d at 6. While still another found the business activity involved in operating a group home was merely incidental to the "the prime purpose and function of a family housekeeping unit." ***Rhodes***, 400 S.E.2d at 486.

¶33.    None of these situations is before us.

¶34.    Here, unlike the nonprofit organizations in those cases, Brandi's Hope does not merely oversee a group home or arrange for residential support services.  Instead, Brandi's Hope leased the home for the specific and sole purpose of providing the residential support services itself and being compensated for doing so through Medicaid.  In other words, when we consider the purpose and method of operation of this home in The Grove residential neighborhood, the commercial activity—Brandi's Hope's paid-for residential support services—is not merely *incidental* to operating the home, it is *integral*.  Indeed, the support services are so integral that, if a resident chooses to use another service provider or discontinue Brandi's Hope's services, he may no longer reside in the home.  So despite the various good services Brandi's Hope provides its tenants, these residential purposes cannot be unlinked from the commercial purpose of Brandi's Hope's venture.

¶35.    Simply put, the reality before this Court is that the house Brandi's Hope leases from Scioto practically functions as a nursing home or assisted-living facility, which the covenants expressly prohibit.  While the four men who have entered the subleases with Brandi's Hope may use the property as their residence, this does not negate the fact Brandi's Hope undoubtedly uses the property in a commercial manner, having expressly leased the home "solely to provide residential support services."  And The Grove's covenants expressly prohibiting commercial use of any residence in the subdivision are clear.

12

¶36. For this reason, we affirm the chancellor's declaratory judgment that Brandi's Hope used the property on Lot 62 commercially and thus violated the protective covenant against commercial use.

¶37. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**