GARCIA ET AL., APPELLANTS, *v.*
SIFFRIN RESIDENTIAL ASSN. ET AL., APPELLEES.

[Cite as Garcia v. Siffrin (1980), 63 Ohio St. 2d 259.]

(No. 79-409—Decided July 30, 1980.)

260

262

*Mr. Vincent J. Bernabei,* for appellants Garcia.

*Mr. Harry E. Klide,* director of law, *Mr. Ronald E. Stocker, Mr. Thomas P. Albu* and *Mr. Thomas M. Bernabei,* for appellant city of Canton.

*Zink, Zink & Zink Co., L.P.A., Mr. Jeffrey E. Zink, Mr. Larry A. Zink* and *Ms. Constance Leistiko,* for appellee Siffrin.

*Mr. William J. Brown,* attorney general, and *Mr. George Stricker, Jr.,* for appellees Moritz and Cannon.

*Mr. John Guendelsberger* and *Mr. Douglas Rogers,* for appellee Ohio Legal Rights Service.

HOLMES, J. Upon a thorough review of the applicable constitutional provisions, the statutes under consideration, the record, transcripts of proceedings and briefs herein, we reverse the Court of Appeals.

We hasten to add at the outset of our discussion of the legal issues presented here that we are fully in sympathy with, and support of, the purposes of R. C. Chapter 5123 which are specifically set forth within R. C. 5123.67. It may not be reasonably questioned that there is considerable merit in a law which seeks to maximize the assimilation of mentally retarded persons into the ordinary life of the community in which they live, and to provide places for them to live in surroundings and circumstances as close to normal as possible. However, in carrying out these salutory state programs in aid of some of our citizens, the constitutional rights of other members of our citizenry, and the constitutional authority which has been granted to our local governments, must always be guarded and not infringed upon.

In this cause we are not dealing with a state statute which attempts to override a discriminatory exercise of local governmental police power, nor are we indeed dealing with laws of the state which were enacted within the same public purpose area as are the local zoning laws. The state, by passage of R. C. 5123.18, was not seeking to establish a program of

statewide land planning, but instead the state sought by this law to assist developmentally disabled persons by placing these persons in a residential setting. On the other hand, the city of Canton, through its zoning code, seeks to regulate land uses in order to develop the city through comprehensive community-wide planning. Here, the operation of this state law in carrying out the otherwise salutory aims of treating and educating the developmentally disabled obviates laws of local governments which have been enacted for an entirely different purpose, *i.e.,* the planned orderly growth of the community.

Here, based upon the facts within the record, some of which have been alluded to previously, we conclude that residents of these licensed facilities may not reasonably be includable within the definition of "family" as set forth in the Canton zoning code. We do not perceive this facility, and its statutorily mandated purposes and duties, to be likened to what is reasonably thought of to be a single housekeeping unit. We believe the facts show that these clients of Siffrin would not be residing in this dwelling unit as a single housekeeping unit in the same sense as would a group of individuals who had joined together in these premises in order to primarily share the rooming, dining and other facilities. The emphasis in such an instance may be placed upon the dwelling aspect of the unit, and upon the fact that those who are living within that structure are sharing and maintaining a household as a single unit.

We conclude based upon all the evidence that the Siffrin facility would be established not for the prime purpose of eight people sharing a dwelling place, but primarily for the purpose of bringing together a group of developmentally disabled persons for their training and education in life skills, and for the establishment and furnishing of a professional plan of habilitation for each client developed by the licensed operator and implemented through the director of such facility and his staff of inter-disciplinary personnel trained and equipped for this purpose. The individualized care and training of these clients who are the resident participants of this program would reasonably appear to be the basis of this program sought to be located at this site.

We do not believe that the operation of this facility constitutes a "family" within the definition of the Canton zoning code.

It being determined that the operation of this facility within the R-2 zoning district of Canton does not comport with the allowable activities for such a district in this community, the question becomes whether this state statute will prevail and override Canton's zoning laws. Municipalities in Ohio are granted the authority to adopt zoning regulations by way of the constitutional home rule provisions of Section 3, Article XVIII of the Ohio Constitution, which provides that:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

This amendment has repeatedly been interpreted by this court as being a direct grant of authority to a municipality to enact local self-government and police regulations. *Village of Struthers* v. *Sokol* (1923), 108 Ohio St. 263; *Youngstown* v. *Evans* (1929), 121 Ohio St. 342.

Whether the passage of zoning ordinances by municipalities constitutes an exercise of constitutionally granted local self-government or police powers presents an interesting question, but a question which in the main has been answered by prior judicial determinations. The Supreme Court of the United States has addressed this issue and held such an ordinance to be an exercise of the municipality's police powers. *Village of Euclid* v. *Ambler Realty Co.* (1926), 272 U.S. 365. This court peripherally addressed this subject in *State, ex rel. Euclid-Doan,* v. *Cunningham* (1918), 97 Ohio St. 130, where the court held that ordinances dealing with the regulation of height, mode of construction, and use of tenement houses were an exercise of police power. In *Pritz* v. *Messer* (1925), 112 Ohio St. 628, this court held that ordinances which divided the municipal territory into districts according to a comprehensive plan which was reasonably necessary for the preservation of the public health, safety and morals would be an exercise of the police power of the municipality.

In *State, ex rel. Toledo,* v. *Lynch* (1913), 88 Ohio St. 71, 97, this court characterized powers of local self-government as

those "powers of government as, in view of their nature and the field of their operation, are local and municipal in character." In *State, ex rel. Toledo,* v. *Cooper* (1917), 97 Ohio St. 86, 91, this court additionally stated that such powers are "not only purely local and purely municipal, but purely governmental."

In a functional sense, zoning prescribes and regulates the conduct of individuals in their use of land. Zoning is not functionally a matter of internal municipal organization, as would be ordinances setting forth the form, structure and operation of the municipal government. Rather, the exercise of the zoning power " '*** aims directly to secure and promote the public welfare, and it does so by restraint and compulsion.' " *Fitzgerald* v. *Cleveland* (1913), 88 Ohio St. 338, 357.

Upon analysis of their function and purpose, we conclude that zoning ordinances are an exercise of the police power granted to municipalities by Section 3, Article XVIII of the Ohio Constitution.

Zoning ordinances may be valid and constitutional enactments pursuant to Section 3, Article XVIII, without the necessity of further state legislative enabling statutes. *Pritz* v. *Messer, supra.* Such laws, being of the nature of policing regulations of the municipality, unlike the municipality's exercise of its powers of "local self-government" which may be described as being of an administrative nature, are subject to the constitutional provision that they not be "in conflict with general law." *State, ex rel. Klapp,* v. *Dayton P. & L. Co.* (1967), 10 Ohio St. 2d 14; *Canton* v. *Whitman* (1975), 44 Ohio St. 2d 62.

There would seem to be no great controversy here that there is a direct conflict between the local zoning ordinance of Canton and R. C. 5123.18(D). May then this state statute override the Canton zoning ordinance by virtue of the statute being a general law? We think not.

"General laws" are defined to mean statutes setting forth police, sanitary or other similar regulations, and not statutes which by their operation only grant or limit the legislative powers of a municipal corporation to adopt or enforce police, sanitary or other similar regulations. *Village of West Jefferson*

v. *Robinson* (1965), 1 Ohio St. 2d 113; *Youngstown* v. *Evans, supra.*

These "general laws" are laws operating uniformly throughout the state, *Leis* v. *Cleveland Railway Co.* (1920), 101 Ohio St. 162, which prescribe a rule of conduct upon citizens generally, and which operate with general uniform application throughout the state under the same circumstances and conditions. *Schneiderman* v. *Sesanstein* (1929), 121 Ohio St. 80. In the main, the provisions of R. C. Chapter 5123 fall within the definition of a "general law" providing a method by which the mentally retarded may hopefully be acclimated to a useful place in society through the licensure of "residential facilities" and the deinstitutionalizing of these mentally retarded individuals. However, subsections (D), (E) and (G) of R. C. 5123.18 are not reasonably related to the valid purposes and objectives of the regulatory and licensing portions of the other sections of this chapter of law. In this attempt to be supportive of the purposes of this chapter, these sections unreasonably and unlawfully limit the enforcement by municipalities of certain of the police powers authorized by the Ohio Constitution to such municipalities.

It is interesting to note in this regard that subsections (E) and (F) of R. C. 5123.18 specifically preserve some enumerated city planning type of police powers to the municipalities in their control of these "licensed facilities." Subsection (E)(1) provides that the city may enact requirements for architectural design, site layout, height of walls, screens and fences to be compatible with adjoining land uses and residential character of the neighborhood; subsection (E)(2) permits regulation of yard, parking and signs; subsection (E)(3) permits the limitation of "excessive concentration of homes." Subsection (F) provides that the section does not prohibit a political subdivision from applying to "residential facilities" regulations regarding health, fire and safety regulations, and building standards and regulations.

In the view of this majority, these sections of law selectively excise certain of the police powers of local government that have been granted to municipalities by the Constitution. Thus, such sections, like those considered in *Village of West Jefferson, supra,* are not general laws.

It is our view that subsections (D) and (E) of R. C. 5123.18, as limited by subsection (G) of that section, suffer an additional infirmity, in that they are special laws prohibited by Section 26, Article II of the Ohio Constitution. Such constitutional provision states, in pertinent part, that, "all laws of a general nature shall have a uniform operation throughout the State***.''

The requirement of uniform operation throughout the state of laws of a general nature does not forbid different treatment of various classes or types of citizens, but does prohibit nonuniform classification if such be arbitrary, unreasonable or capricious. *Miller* v. *Korns* (1923), 107 Ohio St. 287.

R. C. 5123.18(G) creates two distinct classes of municipalities with respect to the operation of subsections (D) and (E): first, municipal corporations that had in effect on June 15, 1977, an ordinance specifically permitting in residential zones licensed residential facilities by means of permitted uses, conditional uses, or special exception, so long as such ordinance remains in effect without any substantive modification; and, second, municipal corporations that did not have such a specific ordinance in effect on June 15, 1977. Those cities which acted prior to June 15, 1977, allowably under subsection (G), could have provided that these "family homes" be located only in the less restrictive residential districts such as those districts permitting apartments, rooming houses, boarding houses, dormitories, and the like. Conversely, cities which did not act prior to June 15, 1977, are, under this subsection, required to permit these licensed facilities within any residential district including the most restrictive, single family districts. This classification is based upon a time requirement which is arbitrary in that it establishes June 15, 1977, as a deadline after which even enactment of an ordinance which would permit such licensed residential facilities in residential zones would not relieve a municipality from the effect of the statute.

Additionally, in complying with subsection (G), even though the city of Canton or other municipality had a zoning ordinance in effect at the "deadline" date, which could reasonably be construed to permit facilities of the type in ques-

tion within certain residential zones, if such ordinance did not *specifically* provide for these licensed residential facilities, the municipality would still come within the purview of the statute.

The desire of the state to make residential zones available to such facilities is a very laudatory one; however, any law enacted to accomplish such purpose must operate uniformly upon all municipalities. The distinction drawn between classes of municipalities by subsection (G) of R. C. 5123.18 is arbitrary and unrelated to the accomplishment of its avowed purpose. It frees some municipalities from state intervention in zoning, while subjecting others to spot zoning by administrative action. Furthermore, it fails to make provision for redemption of the right to exclude such facilities by enactment of remedial legislation after the arbitrary date.

Local option provisions in state statutes do not, *per se,* violate the requirement that all laws of a general nature shall have a uniform operation throughout the state. *Canton* v. *Whitman, supra.* However, R. C. 5123.18(G) should be carefully distinguished from the situation in *Whitman.* In *Whitman,* a municipal corporation could, pursuant to R. C. 6111.13, within a limited time period after enactment of the statute, hold a local election pertaining to fluoridation. In the instant cause, R. C. 5123.18 does not contain any local option provision, and it relates to a date prior to the enactment of the law. The arbitrary fixing of a retrospective date, upon which future rights and powers of a municipality depend, distinguishes this case from *Whitman.*

For these reasons, R. C. 5123.18(D), (E) and (G) are void under Section 26, Article II of the Ohio Constitution, as not being laws of a general nature having uniform operation throughout the state.

Local comprehensive zoning plans have long been held to be a valid exercise of governmental planning and control of land use for the benefit of public health, safety, morals, and general welfare. *Village of Euclid* v. *Ambler Realty Co., supra.* The various zoning provisions, which set forth certain prohibitions, restrictions, or limitations upon the free utilization and enjoyment of one's lands must be a part of a reasonably comprehensive plan for the development of the community.

*Village of Belle Terre* v. *Boraas* (1974), 416 U.S. 1; *Village of Euclid* v. *Ambler Realty, supra.*

A zoning ordinance shown to have a substantial relation to the public health, morals or safety, and not to be arbitrary or discriminatory in its operation or effect, will be upheld as a proper constitutional exercise of the police power of local government.

Here we find that the provision of the Canton zoning ordinance which would prohibit the establishment and operation of this residential facility within a R-2 zoned area is a reasonable exercise of the police power granted to municipalities pursuant to Section 3, Article XVIII of the Ohio Constitution.

The overall Canton zoning ordinance seemingly provides for a comprehensive plan for the growth and development of the city. It may be concluded that the specific section here involved has been enacted as a reasonable part of the overall zoning plan, and it has not been shown that such provision is arbitrary, capricious or discriminatory in its operation. We find that such section of the zoning ordinance does not forfeit an owner's rights or deprive him of the reasonable free use of his property. Accordingly, we hold that such section of the ordinance does not violate Section 19, Article I of the Ohio Constitution, nor the Fourteenth Amendment to the United States Constitution, and therefore we find the provision to be constitutionally valid.

There was evidence at the trial of this matter which tended to show that the Garcias and other adjacent property owners would suffer a diminution in property valuation due to the operation of this residential facility in their neighborhood. The evidence in this regard was adduced both through the testimony of a real estate broker dealing in properties in this general vicinity, and by way of testimony of Mrs. Charlotte Zindle, an Akron resident, concerning the lowering of the valuation of her property when a like kind of facility had been established in her neighborhood in Akron.

To counter this evidence of appellants, Siffrin presented evidence from Ken Suchan, a resident of Wooster, an urban planner by profession, who testified that he had no personal experience in real estate sales, nor was he a real estate broker. He testified that, "****I wouldn't expect that there would be

any difference, any change in—in property values as a result of—of that use being there; and it would, in fact, be almost indistinguishable from the rest of the neighborhood."

Even though the evidence of Mrs. Zindle may not have been probative of the issue of the lowering of real estate values in this Canton neighborhood due to the placement of this facility, the trial court, as trier of the facts, had before it probative evidence offered by both parties which the court could weigh and attribute an amount of significance or weight in determination of the preponderance thereof. The determination of the court found within finding of fact No. 26, *supra*, is in keeping with the evidence, and we hold that it was improper for the Court of Appeals to find that the trial court had erred in this respect.

The appellants assert their standing and right to injunctive relief in the instant matter pursuant to R. C. 713.13.[3] There seems to be no real argument here that the Garcias do in fact have standing. This was acknowledged by the Court of Appeals. We conclude that all the elements of R. C. 713.13 have reasonably been met by the appellants in the presentation of their cause for injunctive relief. The Garcias are the "contiguous" property owners and there was the "imminent threat" that the adjacent property would be utilized in a manner in violation of the zoning ordinance of Canton. Further, it was shown to the satisfaction of the trier of the facts that the Garcias would be "especially damaged" by the placement of this facility adjacent to their residence. Thus, the Garcias did show that they were entitled to the injunctive relief requested.

Based upon all the foregoing, R. C. 5123.18(D), (E) and (G) are hereby held to be unconstitutional. Further, we hold that the provisions of Canton City Code Chapter 1137, insofar as such provide for "R-2 two-family dwellings" that would by their application prohibit the establishment of "licensed

---

[3] "No person shall erect, construct, alter, repair, or maintain any building or structure or use any land in violation of any zoning ordinance or regulation enacted pursuant to sections 713.06 to 713.12, inclusive, of the Revised Code, or Section 3 of Article XVIII, Ohio Constitution. In the event of any such violation, or imminent threat thereof, the municipal corporation, or the owner of any contiguous or neighboring property who would be especially damaged by such violation, in addition to any other remedies provided by law, may institute a suit for injunction to prevent or terminate such violation."

residential facilities" in such a district, constitute a constitutional enactment of the city of Canton.

The judgment of the Court of Appeals is hereby reversed.

*Judgment reversed.*

CELEBREZZE, C. J., HERBERT, W. BROWN and SWEENEY, JJ., concur.

LOCHER, J., concurs in the judgment.

P. BROWN, J., dissents.

PAUL W. BROWN, J., dissenting. For the reasons more fully delineated in my dissent in *Carroll* v. *Washington Twp.* (1980), 63 Ohio St. 2d 249, I must disagree with the majority's resolution of this cause. The majority in the instant cause has again unnecessarily intruded into internal family relations in concluding that a "family home" as defined by R. C. 5123.18(A)(3) is not a family use under the applicable zoning ordinance. Canton zoning ordinance section 1123.30 provides:

" 'Family' means one or more persons occupying a dwelling unit and living as a single housekeeping unit, whether or not related to each other by birth or marriage, as distinguished from a group occupying a boarding house, lodging house, motel, hotel, fraternity or sorority house."

Under this broad definition I cannot conclude that the planned home for these developmentally disabled adults would not constitute a family. The majority seems to base its findings upon the premise that under the zoning ordinances the primary purpose for living as a single housekeeping unit must be to share the rooming, dining and other facilities within the dwelling. This requirement, however, appears nowhere within the zoning scheme. So long as the group functions as a single housekeeping unit, their primary purpose in doing so is irrelevant.

The requirement also makes little sense as a judicially created doctrine. Other courts have wisely not seen fit to intrude into the motivations behind the free choice of individuals who seek to live together as a single housekeeping unit and create such artificial distinctions, with their attendant possibilities of discriminatory application. *E.g., Des Plaines* v. *Trottner* (1966), 34 Ill. 2d 432, 216 N.E. 2d 116; *White Plains*

v. *Ferraioli* (1974), 34 N.Y. 2d 300, 313 N.E. 2d 756. More specifically the courts that have addressed the issue presented here, group homes for retarded adults, have concluded that the homes are single housekeeping units. *Freeport* v. *Association for the Help of Retarded Children* (1977), 94 Misc. 2d 1048, 406 N.Y. Supp. 2d 221; *Oliver* v. *Zoning Commission* (1974), 31 Conn. Supp. 197, 326 A. 2d 841 (where a group home for nine retarded adults was held to constitute a single housekeeping unit, under an almost identical definition of family as that appearing in the Canton ordinances).

Moreover it does not seem so obvious that the individuals who seek to live together here do so primarily to obtain "training and education in life skills." Such training is just as available in institutions whose environment the individuals in this cause have purposely avoided. The primary purpose of these individuals is more likely the avoidance of institutionalization, thus seeking to live in a shared dwelling in a residential neighborhood, in the midst of surroundings as normal as possible.

In *Carroll* v. *Washington Twp., supra,* a case announced this date, it was held that the Ohio Youth Commission's foster home was not a "one family residential dwelling unit." In that case the court stressed the fact that there was no definition of the term "family" contained within the zoning provisions. The court indicated that if the legislative definition could be met it would uphold such a residential use. Yet, in this case, the majority has concluded that the zoning definition focusing upon a single housekeeping unit will not permit the family home sought to be created under R. C. Chapter 5123. Thus, the line to be drawn has conveniently moved in a manner to exclude the family homes, which have been deemed to be so desperately needed. If such a trend should continue the only place for such homes may be factory districts and other non-residential areas. Thus, I conclude as the Court of Apeals did in this cause that the Siffrin home is a permitted use within this R-2 district.

I also do not agree with the majority's home-rule analysis concerning general laws. That opinion concedes the merit inherent in this legislation, but finds itself unable to uphold the constitutionality of R. C. 5123.18(D) and (E). A review of this court's prior case law dealing with this subject, however, leads

me to the contradictory conclusion that these provisions are part of a comprehensive licensing scheme and as such constitute portions of a general law.

In *Village of West Jefferson* v. *Robinson* (1965), 1 Ohio St. 2d 113, this court established the definition of "general laws" stating in paragraph three of the syllabus that:

"The words 'general laws' as set forth in Section 3 of Article XVIII of the Ohio Constitution means statutes setting forth police, sanitary or similar regulations and not statutes which purport *only* to grant or to limit the legislative powers of a municipal corporation to adopt or enforce police, sanitary or other similar regulations." (Emphasis added.) See, also, *Youngstown* v. *Evans* (1929), 121 Ohio St. 342, 345.

If the provisions at issue can be fairly characterized as being designed *only* to prescribe the mode and manner in which municipalities must conduct their zoning, they must be struck down as depriving those local governmental bodies of their constitutionally granted authority. R. C. 5123.18(D) and (E), however, do not merely place limits on municipalities, but in a much greater sense are regulatory of this state's citizenry in a licensing context.

Subsections (A) through (C) of R. C. 5123.18 set up a definitional and procedural framework under which a residential facility may be licensed. Subsections (D) and (E) govern the conduct of individuals. Both of these latter provisions begin with the statement that "[a]ny person may operate a [state] licensed***home," and, in fact, the focus of the entire statutory section is upon individuals who seek to establish the group homes at issue.

The majority relies heavily upon the case of *Village of West Jefferson* v. *Robinson, supra,* in reaching its conclusion that the provisions at issue are not general laws. That case, involving a village that imposed a greater fine for unauthorized peddling than was permitted in the Revised Code, however, is not germane to the instant cause. No state licensure scheme was directly involved there.

On at least five previous occasions this court has held state licensing measures to be general laws. In *Neil House Hotel* v. *Columbus* (1944), 144 Ohio St. 248, regulations of the state Board of Liquor Control governing hours of operation

were upheld over a Columbus ordinance. State laws authorizing licensing of watercraft and creating a fee schedule were upheld over a local ordinance in *State, ex rel, McElroy,* v. *Akron* (1962), 173 Ohio St. 189. In *Anderson* v. *Brown* (1968), 13 Ohio St. 2d 53, this court ruled that a municipality could not require an additional license for trailer parks where a state statute governed such licenses and provided that they "shall be in lieu of all license and inspection fees***." State laws authorizing the licensing and regulation of bingo operations were upheld over a conflicting municipal ordinance in *Lorain* v. *Tomasic* (1979), 59 Ohio St. 2d 1. See, also, *Stary* v. *Brooklyn* (1954), 162 Ohio St. 120.

The case, however, which is most analogous to this cause is *Auxter* v. *Toledo* (1962), 173 Ohio St. 444. There, the state liquor control licensing statute, R. C. 4303.27, providing that, "[e]ach permit issued***shall authorize the person named to carry on the business specified at the place ***described***," was upheld over a Toledo ordinance prohibiting the sale of beer without a city license. It involved the same type of legislative grant at issue here, the affirmative right of a state agency to solely govern the carrying out of a particular use at a specific location. The statute at issue in *Auxter* was held to be a general law. Surely this is the proper conclusion, because the General Assembly may in the licensing context do more than grant the license holder a promise of no future interference from the state. Further interference by a municipality may be safeguarded against, under a specific legislative grant permitting a particular use at a specific location governed by a state agency. To hold otherwise, as the majority has done, is to in effect handcuff the General Assembly so that it may not create areas of statewide licensing which are exempt from local municipal control.

In R. C. 5123.67, the General Assembly specifically set forth the purposes for the enactment of the statutory provisions at issue. That statute provides:

"Chapter 5123 of the Revised Code shall be liberally interpreted to accomplish the following purposes:

"(A) To promote the human dignity and to protect the constitutional rights of mentally retarded persons in the state;

"(B) To encourage the development of the ability and potential of each mentally retarded person in the state to the fullest possible extent, no matter how severe his degree of disability;

"(C) To promote the economic security, standard of living, and meaningful employment of the mentally retarded;

"(D) To maximize the assimilation of mentally retarded persons into the ordinary life of the communities in which they live;

"(E) To recognize the need of mentally retarded persons whenever care in a residential facility is absolutely necessary, to live in surroundings and circumstances as close to normal as possible."

R. C. 5123.18(D) and (E) are integral parts of the legislative goal of deinstitutionalization, which may be carried out effectively only through the use of group homes.

The majority has thwarted this goal by reading subsections (D) and (E) in a vacuum without reference to the remainder of R. C. 5123.18, governing licensing, or the remainder of this statutory chapter. Through such a chosen pattern of interpretation, the majority has impliedly found some rationale to distinguish the instant situation from this court's prior line of cases concerning licensing. Perhaps some hidden policy reason requires the exemption of state liquor licenses from local municipal control but not the family home sought to be established here. Because I cannot also conceive of this policy consideration, I must dissent from the majority's determination that R. C. 5123.18(D) and (E) are not general laws.

Due to my conclusion that the contested provisions are general laws, I would find them to allow the operation of the Siffrin home. This court stated in *Canton* v. *Whitman* (1975), 44 Ohio St. 2d 62, at page 66, that:

"The city may exercise the police power within its borders, but the general laws of the state are supreme in the exercise of the police power, regardless of whether the matter is one which might also properly be a subject of municipal legislation. Where there is direct conflict the state regulation prevails." Accord *Columbus* v. *Teater* (1978), 53 Ohio St. 2d 253.

The majority's holding that subsections (D) and (E) of R. C. 5123.18, as limited by subsection (G) of that statutory section, constitute "special laws" is also unjustified. The conclusion reached that these provisions do not have uniform application flies in the face of the substance of the statute. No single area or type of municipality is singled out, as the statute's mandate is statewide. In *State, ex rel. Stanton,* v. *Powell* (1924), 109 Ohio St. 383, at page 385, this court recognized that:

"* * * Section 26, Art. II of the Constitution, was not intended to render invalid every law which does not operate upon all * * * political subdivisions within the state. * * * [T]he law is equally valid if it contains provisions which permit it to *operate upon every locality where certain specified conditions prevail.*" (Emphasis added.)

R. C. 5123.18(G) merely creates a grandfather clause whereby those municipalities that had pre-existing zoning codes on June 15, 1977, which would specifically allow this type of family home are unaffected by this statute. Grandfather clauses of this type have undisputedly been held valid in other contexts. How R. C. 5123.18(G), which provides that subsections (D) and (E) are redundant and inapplicable where such facilities are already licensed and regulated by local ordinance, adversely affects any municipality is not demonstrated. Simply because some municipalities fall on one side or the other of a valid legislative cut-off does not mean that the cut-off is unreasonable, or that the statute is a "special law" within the meaning of Section 26, Article II of the Ohio Constitution. In *State, ex rel. Lourin,* v. *Indus. Comm.* (1941), 138 Ohio St. 618, at page 623, it was stated:

"* * * [T]he law abounds with situations where a difference of a minute may work a great change in rights and liabilities. Any statute of limitations illustrates this. In the interest of administrative workability, or to effect gradations in legislative policy, certain definite markers must be established, * * *. *It is, of course, for the Legislature to determine just where such boundaries shall be set.*" (Emphasis added.)

Certainly, the allowance of procedural alternatives effec-

tuating the purposes of R. C. 5123.18 does not prevent the statute from having uniform operation throughout the state.

For the foregoing reasons, I would affirm the Court of Appeals in all respects.