[Cite as *State ex rel. Morrison v. Beck Energy Corp.*, 2013-Ohio-356.]

# IN THE COURT OF APPEALS

## NINTH APPELLATE DISTRICT

## SUMMIT COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO ex rel. JACK MORRISON, JR., LAW DIRECTOR CITY OF MUNROE FALLS, OHIO, et al., | : | **O P I N I O N** |
| | : | |
| Plaintiffs-Appellees, | : | |
| | | **CASE NO. 25953** |
| - vs - | : | |
| | : | |
| BECK ENERGY CORPORATION, et al., | : | |
| | : | |
| Defendants-Appellants. | : | |

Civil Appeal from the Summit County Court of Common Pleas, Case No. CV2011-04-1897.

Judgment: Reversed and remanded.

*Thomas Saxer* and *Scott E. Mullaney*, Amer Cunningham Co., LPA, Sixth Floor, Society Building, 159 South Main Street, Suite 1100, Akron, OH 44308-1322 (For Plaintiffs-Appellees).

*John W. Solomon,* Vorys, Sater, Seymour and Pease LLP, 106 South Main Street, Suite 1100, Akron, OH 44308, and *John K. Keller* and *Robert J. Krummen*, Vorys, Sater, Seymour and Pease LLP, 52 East Gay Street, P. O. Box 1008, Columbus, OH 43216-10008 (For Defendants-Appellants).

MARY JANE TRAPP, J., Eleventh Appellate District, sitting by assignment.

{¶1} Beck Energy Corporation secured a permit from Ohio's Department of Natural Resources to drill on Joseph Willingham's property located in the City of Munroe Falls, Ohio. When Beck Energy began drilling on the property, the city issued a Stop Work Order and filed a complaint in the Summit County Court of Common Pleas for an

injunction to stop Beck Energy from drilling. The city claimed Beck Energy did not comply with its ordinances requiring permits for drilling, zoning, and rights-of-way construction. The trial court granted the injunctive relief sought by the city and Beck Energy and Mr. Willingham brought this appeal.

{¶2} On appeal, the question to be answered is whether the City of Munroe Falls can enforce its ordinances governing oil and gas drilling and related zoning and rights-of-way issues despite the state's comprehensive statutory scheme for drilling set forth in R.C. Chapter 1509. This appears to be an issue of first impression.[1]

{¶3} In 2004, the General Assembly enacted statutes granting exclusive regulation over oil and gas wells in Ohio to the Ohio Department of Natural Resources. While we recognize that gas and oil drilling brings economic benefits to the entire state, we also recognize that the burden of potential risk and harm, especially to a local area's infrastructure, is borne by the local residents in the wells' immediate surroundings. But our role is not to make policy decisions and re-write either state law and regulations or local zoning ordinances; we are compelled to follow the established law in our application of the constitutional home-rule analysis to Monroe Falls' drilling ordinances. Because the drilling ordinances are in direct conflict with the state statutes, the city cannot enforce the ordinances as presently written. The city, however, is permitted to enforce pertinent right-of-way ordinances in the face of the drilling activities, provided these ordinances are not enforced in a discriminatory manner against oil and gas well drilling.

---

1. All the judges from the Ninth District Court of Appeals recused themselves from the case. The instant panel from the Eleventh District Court of Appeals sits by assignment.

2

## Substantive Facts and Procedural History

{¶4} Mr. Willingham leased gas rights to Beck Energy Corporation ("Beck Energy") for several acres of property he owns within the City of Munroe Falls. Beck Energy applied for a well permit from the Ohio Department of Natural Resources ("ODNR"), Division of Mineral Resources Management, to drill a gas well on the property. After reviewing the application, the division issued a well permit (#2-3126) to Beck Energy on February 16, 2011. The permit sets forth terms and conditions, including 29 Urbanized Area Permit Conditions, which include specific requirements governing tree trimming, fencing, parking, noise, erosion, drainage, landscaping, and site restoration.

{¶5} When Beck Energy began excavation and drilling at Mr. Willingham's residence, the city issued a Stop Work Order, alleging Beck Energy violated several ordinances in drilling at the property without first obtaining various necessary permits from the city. On April 6, 2011, the city and its Law Director, Jack Morrison, Jr. (hereafter "the city"), filed a complaint in the Summit County Court of Common Pleas to enjoin Beck Energy from engaging in drilling activities on Mr. Willingham's property until it complies with 11 ordinances and acquires the necessary permits pursuant to the ordinances. In conjunction with the complaint, the city also filed an application for preliminary and permanent injunction.

{¶6} The city claimed that in order to engage in the drilling activity, Beck Energy must, as prescribed in the city's ordinances: (1) obtain a drilling permit, a "conditional" zoning certificate, and a zoning certificate; (2) appear before the city's planning commission in a public hearing and obtain its approval; (3) pay the necessary

3

fees and post the requisite performance bond; and (4) obtain a rights-of-way construction permit and pay the required fees.

{¶7} After the city filed the complaint, the parties agreed to maintain the status quo and refrain from any drilling activity, and to submit briefs to the trial court addressing whether an injunction should be issued. On May 3, 2011, the trial court entered a preliminary injunction, and subsequently entered an order granting a permanent injunction, enjoining Beck Energy from operations related to drilling on the subject property until all relevant Munroe Falls ordinances have been complied with.

{¶8} Beck Energy now appeals from that order.[2] It assigns the following error for our review:

{¶9} "The trial court erred as a matter of law when it held that local city ordinances, which prohibit defendants' gas drilling operations in the absence of City-issued permits, are not in conflict with Ohio state statutes, which specifically allow those operations pursuant to a State-issued permit. The trial court's ruling that the ordinances are within the city's home-rule authority should therefore be reversed."

**Standard of Review for Injunction**

{¶10} "'An injunction is an extraordinary remedy in equity where there is no adequate remedy available at law. It is not available as a right but may be granted by a court if it is necessary to prevent a future wrong that the law cannot.' * * * The grant or denial of an injunction is within the trial court's discretion and will not be disturbed by a reviewing court absent an abuse of that discretion. * * * In order to find an abuse of that discretion, we must determine that the trial court's decision was unreasonable, arbitrary

2. The State of Ohio, through its Attorney General, filed an amicus curiae brief in this appeal. It states that it "supports neither party, but seeks only to protect the integrity of Ohio's comprehensive, statewide system for regulating oil and gas drilling while allowing for local regulations that do not interfere with state law." This court accepted the amicus curiae brief.

4

or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 5 Ohio B. 481, 450 N.E.2d 1140 (1983)." (Internal citations omitted.) *Heron Point Condo. Unit Owner's Assn. v. E.R. Miller, Ltd.*, 9th Dist. Nos. C.A. Nos. 25861, 25863, 25998, 2012-Ohio-2171, ¶15.

### Standard of Review for Conflict Determination

{¶11} The central issue in this case is whether Monroe Falls' ordinances governing drilling and related matters conflict with R.C. 1509.02. "Whether there is a conflict between a city's ordinance and the state's general law presents a question of law, which this Court reviews de novo." *Smith Family Trust v. City of Hudson Bd. of Zoning and Bldg. Appeals*, 9th Dist. No. 24471, 2009-Ohio-2557, ¶10, citing *Ohio Bell Tel. Co. v. Pub. Util. Comm.*, 64 Ohio St.3d 145, 147 (1992).

### R.C. 1509.02: The Oil and Gas Drilling Statute

{¶12} This appeal concerns the scope of R.C. Chapter 1509, Ohio's oil and gas drilling statutes. Pursuant to its constitutional authority, the General Assembly enacted R.C. Chapter 1509 in 1965 to regulate all oil and gas drilling and production operations in Ohio. *See Redman v. Ohio Dept. of Industrial Relations*, 75 Ohio St.3d 399 (1996). In 2004, the General Assembly enacted H.B. 278, which expanded the regulatory scheme and amended R.C.1509.02 to give the Division of Mineral Resources Management of the Ohio Department of Natural Resources the "sole and exclusive authority to regulate the permitting, location, and spacing of oil and gas wells."

{¶13} Subsequently, the General Assembly enacted S.B. 165, effective June 30, 2010, which further expanded ODNR's regulatory authority to include "production operations."

5

{¶14} The General Assembly again expanded ODNR's authority in H.B. 153, effective September 28, 2011. It amended ODNR's authority to include "well stimulation," "completing," "construction" of site, and "permitting related to those activities."

{¶15} R.C. 1509.02 in its current form reads, in pertinent part:

{¶16} "There is hereby created in the department of natural resources the division of oil and gas resources management, which shall be administered by the chief of the division of oil and gas resources management. The division has sole and exclusive authority to regulate the permitting, location, and spacing of oil and gas wells and production operations within the state, excepting only those activities regulated under federal laws for which oversight has been delegated to the environmental protection agency and activities regulated under sections 6111.02 to 6111.029 of the Revised Code. The regulation of oil and gas activities is a matter of general statewide interest that requires uniform statewide regulation, and this chapter and rules adopted under it constitute a comprehensive plan with respect to all aspects of the locating, drilling, well stimulation, completing, and operating of oil and gas wells within this state, including site construction and restoration, permitting related to those activities, and the disposal of wastes from those wells. Nothing in this section affects the authority granted to the director of transportation and local authorities in section 723.01 or 4513.34 of the Revised Code, provided that the authority granted under those sections shall not be exercised in a manner that discriminates against, unfairly impedes, or obstructs oil and gas activities and operations regulated under this chapter."

{¶17} R.C. Chapter 1509 thus provides a comprehensive regulatory scheme for oil and gas wells operations in the state. A person wishing to drill a well for oil or gas

must first obtain a drilling permit from the Division of Mineral Resources Management. R.C. 1509.05 and R.C. 1509.06. R.C. 1509.021 governs minimum distance restrictions on the surface location of wells and other facilities relative to existing property lines, dwellings, buildings, and streets and roads. R.C. 1509.03 governs safe operations of wells, protection of water supplies, necessity of fencing and screening, and mitigation of noise. R.C. 1509.04 authorizes ODNR's oversight after a permit is issued – by providing for enforcement mechanisms which would allow the state to suspend operations that threaten public safety or endanger natural resources. Finally, R.C. 1509.07 governs insurance and surety bond requirements.

{¶18} The statute on its face, however, reserves certain aspects of the oil and gas wells' operations to the control of other authorities, stating, "Nothing in this section affects the authority granted to the director of transportation and local authorities in section R.C. 723.01 and R.C. 4513.34."

{¶19} R.C. 4513.34, not at issue in this case, permits local authorities and the Ohio Department of Transportation to grant permits for oversize vehicles to use the roads in their respective jurisdictions.

{¶20} R.C. 723.01 ("Care, supervision, and control of public roads") is relevant to this appeal. That statute provides, in relevant part:

{¶21} "Municipal corporations shall have special power to regulate the use of the streets.  * * * [T]he legislative authority of a municipal corporation shall have the care, supervision, and control of the public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts within the municipal corporation."

{¶22} However, the statute expressly forbids the local authorities or the director of transportation from exercising power under R.C. 723.01 or R.C. 4513.34 in a manner

7

that "discriminates against, unfairly impedes, or obstructs oil and gas activities and operations regulated." R.C. 1509.02.

### Issue on Appeal

**{¶23}** Beck Energy claims the city impermissibly applied its ordinances to prohibit drilling on Mr. Willingham's property, which has been sanctioned by a well permit issued by ODNR, pursuant to R.C. 1509.02. It maintains the city's attempt to use its ordinances to regulate gas wells conflicts with the express directive of R.C. 1509.02, which gives the state the sole and exclusive authority to regulate gas production operations within Ohio. Its position is that the permit issued by the state precludes any regulation or control of the drilling activity by the city.

**{¶24}** The city, on the other hand, maintains local municipalities have home-rule authority, under Section 3, Article XVIII of Ohio Constitution, to regulate gas drilling operations, because the authority given to the state by the statute only pertains to "permitting, location, and spacing of" oil and gas well productions.

**{¶25}** The issue to be resolved in this appeal, as we see it, is whether, under a home-rule analysis, R.C. Chapter 1509 precludes *any* local control or oversight of oil and gas drilling taking place within the municipality's boundaries.

### The Home-Rule Analysis

**{¶26}** Ohio Constitution, Article XVIII, Section 3 confers upon municipalities the "authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." *Morris v. Roseman*, 162 Ohio St. 447, 449 (1954). This section "is self-executing, and [ ] the power of local self-government is inherent in all

8

municipalities regardless of enabling legislation and the existence of municipal charters." *Id.* at 450.

**{¶27}** The Supreme Court of Ohio reiterated a three-step process for a home-rule analysis in *Ohioans for Concealed Carry, Inc. v. City of Clyde*, 120 Ohio St.3d 96, 2008-Ohio-4605.

### A. First Step: Whether the Ordinance is an Exercise of Local Self-government

**{¶28}** The first step is to determine whether the ordinance is an exercise of local self-government or an exercise of local police power. *Clyde* at ¶24. "An ordinance created under the power of local self-government must relate 'solely to the government and administration of the internal affairs of the municipality.'" *Clyde* at ¶30, quoting *Marich v. Bob Bennett Constr. Co.*, 116 Ohio St.3d 553, 2008-Ohio-92, ¶11, quoting *Beachwood v. Cuyahoga Cty. Bd. of Elections*, 167 Ohio St. 369 (1958), paragraph one of the syllabus. The Supreme Court of Ohio provided the following test to determine whether a particular ordinance is an exercise of local self-government:

**{¶29}** "'To determine whether legislation is such as falls within the area of local self-government, the result of such legislation or the result of the proceedings thereunder must be considered. If the result affects only the municipality itself, with no extraterritorial effects, the subject is clearly within the power of local self-government and is a matter for the determination of the municipality. However, if the result is not so confined it becomes a matter for the General Assembly.'" *Kettering v. State Employment Relations Bd.*, 26 Ohio St.3d 50, 54 (1986), quoting *Cleveland Elec. Illuminating Co. v. Painesville*, 15 Ohio St.2d 125, 129 (1968), quoting *Beachwood* at 371.

9

**{¶30}** Once a local ordinance is determined to relate solely to matters of self-government, it is the end of the analysis, because the Constitution authorizes a municipality to exercise all powers of local self-government within its jurisdiction. *Clyde* at ¶24.

**B. Second Step: If the Ordinance is an Exercise of Police Power, then We Apply General-Law Analysis**

**{¶31}** The second step is necessary if the local ordinance is determined to be an exercise of police power, rather than local self-government. *Clyde* at ¶25. Police-power ordinances are those that "protect the public health, safety, or morals, or the general welfare of the public." *Id.*

**{¶32}** If an ordinance is determined to be an exercise of police power, the court then is required to review the statute at issue to determine whether the statute is a "general law." *Clyde* at ¶25. If the statute qualifies as a "general law," it trumps the local ordinance, *if* the local ordinance conflicts with the state statute. *Id.*

**{¶33}** "General laws are those 'which prescribe a rule of conduct upon citizens generally, and which operate with general uniform application throughout the state under the same circumstances and conditions.'" *Smith Family Trust, supra,* at ¶10, quoting *Garcia v. Siffrin Residential Assn.*, 63 Ohio St.2d 259, 271 (1980), overruled on other grounds by *Saunders v. Clark County Zoning Dept.*, 66 Ohio St.2d 259 (1981).

**{¶34}** The Supreme Court of Ohio set forth a four-part test in *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, to determine if the statute qualifies as a general law:

**{¶35}** "To constitute a general law for purposes of home-rule analysis, a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police,

10

sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally." *Id*. at syllabus.

{¶36} "A state statute takes precedence over a local ordinance when (1) the ordinance is in conflict with the statute, (2) the ordinance is an exercise of the police power, rather than of local self-government, and (3) the statute is a general law." *Id*. at 151.

{¶37} At the same time, a municipality "is vested with primary authority to enact police power ordinances not in conflict with the state's general laws. Section 3, Article XVIII of the Ohio Constitution grants municipalities the power '* * * to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.'" *Fondessy Enterprises, Inc. v. Oregon*, 23 Ohio St.3d 213, 215 (1986). "Nor can this power of home rule, expressly conferred upon municipalities, be withdrawn by the General Assembly." *Id*. citing *Akron v. Scalera*, 135 Ohio St. 65, 66 (1939). "The authority conferred by Section 3, Article XVIII of the Ohio Constitution upon municipalities to adopt and enforce police regulations is limited only by general laws in conflict therewith upon the same subject matter." *Id.* at paragraph one of the syllabus.

### C. Third Step: the Conflict Analysis

{¶38} The final step in the home-rule analysis is, therefore, to determine whether the ordinance conflicts with the statute. The test is "whether the ordinance prohibits that which the statute permits, or vice versa." *Clyde, supra,* at ¶53, citing *Struthers v. Sokol*, 108 Ohio St. 263 (1923), paragraph two of the syllabus. *See also Marich, supra,* at ¶30. "Determining whether a conflict exists requires us to examine inconsistencies and

11

contradictions between the ordinance and the statute." *Rispo Realty & Dev. Co. v. Parma*, 55 Ohio St.3d 101, 105 (1990).

**{¶39}** Applying the *Struthers* conflict test, the Supreme Court of Ohio in *Fondessy, supra,* validated a local ordinance which appeared to regulate an area seemingly preempted by a state statute*.*

**{¶40}** In *Fondessy*, the court considered whether there was a conflict between the state statute that granted the state the power to license and regulate hazardous waste facilities (R.C. Chapter 3734), and a municipal ordinance that imposed a permit fee on all hazardous waste landfills located within the city, and also required that waste facility operators keep complete and accurate records. The court, applying the conflict test, concluded that the municipal ordinance did not conflict with the statute regulating the state's hazardous waste landfills, because the ordinance did not permit anything prohibited by the state statute, or prohibit anything permitted by the statute. The court held that the reporting requirement did not "alter, impair, or limit" the operation of the hazardous waste facility licensed, as prohibited by the statute.

**{¶41}** The court held that "[w]here state laws and municipal ordinances concerning the monitoring of hazardous waste landfill facilities located within the corporate limits of the city do not conflict, the state and municipality have concurrent authority under their respective police powers to enforce their respective directives within the corporate limits of the city." *Fondessy* at paragraph four of the syllabus. In addition, "[t]he authority of the Environmental Protection Agency to license, supervise, inspect, and regulate hazardous waste facilities does not preclude municipalities from enacting police power ordinances which do not conflict with that authority." *Id.* at paragraph five of the syllabus.

12

**{¶42}** The court explained that the city's requirement for the waste facility operator to keep daily records and to report to the municipality did not impede the operator "in any substantive or significant way." *Id.* at 217. It observed, for example, that nothing in the ordinance required the operator to have taller fences, more guards, or more monitoring wells. Thus, although the statute regulating the hazardous waste landfill facility (R.C. 3734) seemingly preempted the regulations of such facilities, the court nonetheless validated the municipal ordinance, which it deemed not in conflict with the state law.[3]

**{¶43}** With the three-step home-rule analysis in mind, we are now ready to review the 11 ordinances the City of Munroe Falls sought to enforce regarding Beck Energy's drilling activities on Mr. Willingham's property.

### Munroe Falls Ordinances

**{¶44}** The city's complaint for injunction cited 11 ordinances the city believed to be implicated by Beck Energy's drilling activity. The 11 ordinances are from various chapters of the Munroe Falls Codified Ordinances, enacted in the 1980's and 1990's. They fall into three categories, drilling, zoning, and rights-of-way. Among the 11, four are from Chapter 1329, which specifically governs oil and gas drilling and were enacted in 1980.

### Drilling Permit and Public Hearing Required

---

3. The Eighth District, in *Cleveland v. GSX Chemical Services, Inc.*, 8th Dist. No. 60512, 1992 Ohio App. LEXIS 2353 (May 7, 1992), a case also concerning whether R.C. Chapter 3734 preempted a municipal ordinance governing hazardous waste facilities, applied *Fondessy* and validated the ordinance, which required reporting to the local authority upon the breakdown of an emission source and subsequent release of excessive air contaminants. The Eighth District concluded that the local regulation did not impair or limit the operation of a chemical company; the local regulation included additional requirements that were "not contained in or required by the state law and were also not proscribed by state law." *Id.* at *18.

13

{¶45} Ordinance 1329.03, at the heart of this appeal, states that no one "shall commence to drill a well for oil, gas, or other hydrocarbons" within the corporate limits until such a person has "wholly complied with all provisions of this chapter and a conditional zoning certificate has been granted by Council."

{¶46} Ordinance 1329.04 requires any person "desiring to drill a well for oil and/or gas within the corporate limits" to apply for a "conditional zoning certificate" to the city's Planning Commission. The ordinance also requires an application of $800 to be paid when an application is filed.

{¶47} Ordinance 1329.05 requires a mandatory public hearing be held at least three weeks before the commencement of drilling. All property owners and residents within 1,000 feet of the well head are to be notified of the hearing. This public hearing is required before the "conditional zoning certificate" can be granted for drilling.

{¶48} Ordinance 1329.06 requires a $2,000 performance bond at the time of an application under Chapter 1329.

### Zoning Certificate Required

{¶49} Next, one of the 11 cited ordinances is from Chapter 1163, which governs zoning. Ordinance 1163.02 governs the issuing of zoning certificates and was enacted in 1995. The zoning ordinance is implicated in this case because the city requires a zoning certificate to be obtained before any "building or other structure" is erected or constructed. This ordinance also requires that a "conditional zoning certificate" be approved before a zoning certificate can be issued.

### Rights-of-Way Construction Permit and Excavation Permit Required

{¶50} Six of the 11 cited ordinances govern rights-of-way matters within the city's limit. Ordinance 919.04 requires a rights-of-way construction permit and a street

14

opening permit for any activities impacting the city's roads in any manner. Ordinance 919.05 prohibits the obstruction of rights-of-way without the city's prior consent. Ordinance 919.06 and 919.07 govern the application and issuance of a rights-of-way construction permit. Ordinance 919.08 governs the fees for such permits. Ordinance 905.02 requires anyone seeking to "make any tunnel, opening, or excavation of any kind in or under the surface of any street" to secure an excavation permit from the city.

{¶51} Citing the 11 ordinances, the city claims that for a drilling activity to begin, the person seeking to drill must (1) appear at a public hearing three weeks before the drilling starts, (2) obtain a drilling permit (which is granted only after a "conditional zoning certificate" is approved by the city council), (3) receive a "zoning certificate" (which also requires the prior issuance of a "conditional zoning certificate"), (4) apply for a rights-of-way construction permit and street excavation permit, and (5) pay all permit fees and performance bond.

**The Trial Court's Judgment**

{¶52} In its application of the home-rule analysis to these ordinances, the trial court pointed out that the ordinances governing the public roads fall clearly within the authority over public roads reserved for the local authorities in the statute, and further, that Beck Energy did not claim that the ordinances were applied to it in an unreasonable manner prohibited by the statute.

{¶53} Regarding the ordinances unrelated to the city's rights of way, the court opined that, although the General Assembly has created a uniform system for the permitting of oil and gas wells throughout the state, it did not authorize drilling companies, "permit-in-hand," to ignore any and all local regulations. Without elaborating, the court concluded local subdivisions retain a limited interest in regulating

15

gas and oil production in their communities. The court held that Beck Energy is enjoined from the drilling operations until it has complied with "all relevant Munroe Falls ordinances."

**Our Application of Home-Rule Analysis to the Munroe Falls Ordinance**

{¶54} We begin with the recognition that oil and gas drilling statute specifically states that the regulation of oil and gas activities "is a matter of general statewide interest that requires uniform statewide regulation, and [Chapter 1509] constitutes a comprehensive plan" for such activities. We are reminded by the Supreme Court of Ohio, as recently as 2008, however, that "'[a] statement by the General Assembly of its intent to preempt a field of legislation is a statement of legislative intent' that may be considered in a home-rule analysis but does not dispose of the issue." *Clyde* at ¶29, citing *Am. Fin. Servs. Assn. v. City of Cleveland*, 112 Ohio St.3d 170, 2006-Ohio-6043, ¶31. When a statute embodies the General Assembly's intent to occupy a certain field, that intent "does not trump the constitutional authority of municipalities to enact legislation pursuant to the Home Rule Amendment, provided that the local legislation is not in conflict with general laws." *Id.* Thus, although the statute seemingly preempts local ordinances in oil and gas drilling, we still must engage in the home-rule analysis to determine whether any local regulations survive under the home-rule power. *Id.* We begin with the inquiry of whether the ordinances are local self-government or police power legislation.

{¶55} In the first step of the analysis, we consider whether the ordinances implicate a municipality's exercise of local self-government. If the subject matter relates to a municipality's self-governance under the analysis given by the Supreme Court of Ohio in *Beachwood, supra,* and *Kettering*, *supra,* the analysis ends because the

16

Constitution authorizes a municipality to exercise powers of local self-government within its jurisdiction. *Am Fin. Serv. Assn.* at ¶23. If, on the other hand, the ordinances implicate health, safety, or the general welfare of the public, then it is an exercise of a municipality's police power. *Clyde* at ¶30.

**{¶56}** Regarding Munroe Falls' ordinances that require a "conditional zoning certificate" before drilling (Ordinances 1163.02, 1329.03, 1329.04, 1329.05, 1329.06), Ohio law has long recognized that the enactment of zoning laws by a municipality is an exercise of its police power as described under Section 3, Article XVIII of the Ohio Constitution. *Rispo Realty & Dev. Co., supra,* at 103, citing *Garcia, supra,* at paragraph two of the syllabus.

**{¶57}** Regarding the rights-of-way ordinances, the parties do not dispute that they are the city's exercise of its police power, as they seek to protect the public safety and general welfare.

**{¶58}** The next step in the home-rule analysis asks whether the oil and gas drilling statute is a "general law." This court has already determined, in *Smith Family,* that "R.C. 1509 et seq., regulates the conservation of natural resources and is unquestionably a general law." *Smith Family* at ¶11. The city concedes it is a general law; thus, we will refrain from engaging anew in the "general law" analysis provided in *Canton*, *supra,* and follow the precedent from this court.

**{¶59}** Therefore, the issue to be resolved in this appeal boils down to whether the ordinances Munroe Falls attempts to enforce are in conflict with R.C. 1509.02. "In the event of a direct conflict, the state regulation prevails." *Smith Family* at ¶10, citing *Garcia* at 271

**Rights- of-Way Ordinances Do Not Conflict with R.C. 1509.02**

17

{¶60} Ordinances from Chapter 905 (Excavations) and Chapter 919 (Rights-of-Way) do not conflict with R.C. 1509.02. R.C. 1509.02 specifically leaves the regulation of rights-of-way to the municipalities, stating, "Nothing in this section affects the authority granted to * * * local authorities in section 723.01 * * * of the Revised Code, provided that the authority granted under those sections shall not be exercised in a manner that discriminates against, unfairly impedes, or obstructs oil and gas activities and operations regulated under this chapter." R.C. 723.01, in turn, provides "[m]unicipal corporations shall have special power to regulate the use of the streets. * * * [T]he legislative authority of a municipal corporation shall have the care, supervision, and control of the public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts within the municipal corporation."

{¶61} Munroe Falls' rights-of-way ordinances regulate the care, supervision, and control of the city's public roads. Therefore, they fall under the authority expressly reserved for the municipalities in R.C. 1509.02 and R.C. 723.01. By the statute's own terms, no conflict exits.

{¶62} We now turn to the heart of this appeal: whether Munroe Falls' drilling ordinances, which require a permit, application fees, and performance bond prior to the commencement of drilling activities, are in conflict with the statute.

### The Drilling Ordinances Conflict With R.C. 1509.02

{¶63} Munroe Falls' position, with which the trial court agreed, is that R.C. 1509.02 limits the state's authority to the "permitting, location, and spacing" of oil and gas wells. And, as Monroe Falls maintains, because none of the ordinances infringe upon "permitting, location, and spacing" of oil and gas wells, they are not in conflict with the statute. Munroe Falls bases its claim on the second sentence of R.C. 1509.02,

18

which states, "[t]he division has sole and exclusive authority to regulate the permitting, location, and spacing of oil and gas wells and production operations within the state * * *."[4]

{¶64} Munroe Falls' position is difficult to maintain, because the statute goes on to state that, "this chapter and rules adopted under it constitute a comprehensive plan with respect to all aspects of the locating, drilling, well stimulation, completing, and operating of oil and gas wells within this state, including site construction and restoration, permitting related to those activities, and the disposal of wastes from those wells."

{¶65} Thus, the statute is more encompassing than Munroe Falls claims. It includes not only "permitting, locating, and spacing" but also "drilling, well stimulation, completing, and operating" of oil and gas wells. In our view, the city's requirement for a permit directly conflicts with the statute, as it could prohibit what the state has permitted.

{¶66} In this case, the state had issued a permit to Beck Energy to drill at Mr. Willingham's property. Munroe Falls cannot hinder the drilling activity by requiring a drilling permit. *See Sheffield*, *supra*. We note, additionally, that the permit remains valid for only 12 months, thus, even if the city ultimately approves of the drilling, the application process could potentially consume much of that time and effectively

---

4. In *Natale v. Everflow Eastern, Inc.,* 195 Ohio App.3d 270, 2011-Ohio-4304 (11th Dist.), appellant filed a nuisance action against a neighbor who operated a drilling well. The Eleventh District held that, because appellant's claims were based on the *location* and *operation* of the well, the local nuisance ordinance is preempted by the statute.

prevents the drilling already permitted by the state.[5]  The drilling ordinance (Ordinance 1329.03) undeniably conflicts with the state statute.

{¶67}  Indeed, the city's own Ordinance 1329.02 recognizes that its drilling ordinances cannot conflict with R.C. Chapter 1509.  Ordinance 1329.02 states:

{¶68}  "(a) It is hereby expressly stated to be the intent of this chapter in addition to prescribing minimum standards to make drillings as safe as possible within the Municipality and to also cause drilling activities to be carried on within the Municipality in non-industrial and industrially zoned areas, in accordance with Ohio R.C. 1509."  By the city's own recognition, the intent of its drilling ordinances is to prescribe "minimum standards to make drillings as safe as possible" and to cause drilling activities to be carried out "in accordance with Ohio R.C. 1509."

{¶69}  Similarly, we find the city's imposition of an $800 local permit application fee and a $2,000 performance bond to be in conflict with the state law, which already imposes a fee of $2,000 and a performance bond.

{¶70}  We now turn to the city's requirement for a pre-drilling public hearing.

**Public Hearing Requirement Also Conflicts with R.C. 1509.02**

{¶71}  Ordinance 1329.05 requires that "[a]fter the first reading, but before the third reading of the legislation granting a conditional zoning certificate, Council shall require the applicant to schedule a public hearing * * * and the permittee shall cause all

---

5.  As a side note, we observe that Beck Energy's permit expired on February 12, 2012.  The expiration of the permit, however, did not render the instant appeal moot, because the issue presented here is capable of repetition, yet evading review.  The "capable of repetition, yet evading review" doctrine is an exception to the general rule against deciding moot issues that applies when: (1) the challenged action is too short in duration to be fully litigated before its expiration, and (2) there is a reasonable expectation that the complaining party will be subjected to the same action in the future. *See City of Munroe Falls v. Chief, Div. of Mineral Res. Mgmt.*, 10th Dist. No. 10AP-66, 2010-Ohio-4439, citing *State ex rel. Cincinnati Enquirer v. Ronan*, 124 Ohio St.3d 17, 2009-Ohio-5947.  In any event, appellant filed a "Notice of Supplemental Authority" informing us that the subject permit has been extended to June 12, 2013.

property owners and residents * * * within 1,000 feet of the well head to be notified of such hearing * * *." It also requires that the public meeting occur no less than three weeks before the drilling commences. It states that compliance with the hearing provision is a mandatory condition precedent to the commencement of drilling under the permit.

{¶72} The elected representatives of Munroe Falls enacted the ordinance to allow, understandably, the residents in the adjacent area most directly affected by the drilling activity to publicly voice their concerns by way of a public hearing. However, Ordinance 1329.05(d) states: "Compliance with the hearing provision of this chapter shall be mandatory conditions precedent to the commencement of drilling under the permit." Because the public hearing provision is tied to the issuance of a drilling permit, which we have determined the city has no authority to require, Ordinance 1329.05, as drafted, is invalid as it is in conflict with R.C. 1509.02. However, the statute does not expressly prohibit a public hearing, thus, in our view, the city is within its authority to require a public hearing. Such a requirement may be achieved by a proper redrafting of the ordinance, where it is not a condition precedent to the issuance of a drilling permit.

#### Zoning Ordinance Invalid to the Extent it Interferes with the State's Permit

{¶73} Ordinance 1163.02 was enacted 15 years after the city's drilling ordinances, and is not a model of clarity. It governs zoning in general, requiring a zoning certificate for the construction of any building or structure, which, in turn, can only be issued if a "conditional zoning certificate" has been approved. Because drilling necessarily involves the construction of a well, this ordinance, to the extent it requires a zoning certificate and "conditional zoning certificate" for drilling, conflicts with R.C. 1509.02 and cannot be enforced against a person seeking to drill.

21

**Conclusion**

{¶74} With the state permit in hand, Beck Energy began drilling at the residence of Mr. Willingham. The city issued a Stop Work Order and sought to enjoin Beck Energy from drilling without first obtaining various permits from the city pursuant to its 11 ordinances. Stating "local communities retain a right to oversee [drilling] activities within their territory," the trial court granted the city the injunctive relief it sought and ordered Beck Energy to comply with the ordinances cited by the city. As we have concluded in the foregoing analysis, the drilling ordinances (Ordinances 1329.03, 1329.04, 1329.05, and 1329.06) are in direct conflict with R.C. 1509.02 and therefore preempted by this state law. Moreover, the provision of the zoning ordinance (Ordinance 1163.02) cannot be applied to drilling activities as it is similarly in conflict with R.C. 1509.02. The city, however, may enforce ordinances governing rights-of-way and excavations (Ordinances 919.04, 919.05, 919.06, 919.07, 919.08, and 905.02), but cannot enforce these rights-of-way ordinances in a way that discriminates against, unfairly impedes, or obstructs oil and gas activities and operations.

{¶75} We therefore conclude the trial court abused its discretion by enjoining its drilling operations until Beck Energy has complied with all the ordinances cited by the city of Munroe Falls in its complaint.

{¶76} Therefore, we reverse and remand the matter to the trial court with instructions to enter judgment stating that Ordinances 1329.03, 1329.04, 1329.05, 1329.06, and 1163.02 are preempted by the state law and cannot be enforced against Beck Energy's drilling activity. Beck Energy, however, must apply for pertinent permits in compliance with the ordinances governing rights-of-way and excavations (Ordinances

22

919.04, 919.05, 919.06, 919.07, 919.08, and 905.02), if its activity impacts in any manner the city's streets.

{¶77} The judgment of the Summit County Court of Common Pleas is reversed and remanded.


TIMOTHY P. CANNON, P.J.,
Eleventh Appellate District,
Sitting by assignment,

THOMAS R. WRIGHT, J.,
Eleventh Appellate District,
Sitting by assignment,

concur.